## APPEAL OF JOSIAH KISTERBOCK.

### [ELBERT v. KISTERBOCK ET AL.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 3 OF PHILADELPHIA COUNTY, IN EQUITY.

Argued January 11, 1889—Decided October 7, 1889.
[To be reported.]

1. A certificate of stock, issued by a corporation having legal power to issue such certificates, is a continuing affirmation that the holder therein named is the owner of the amount of stock specified, upon which a

purchaser or pledgee, dealing with the person named in the certificate or his assignee, has a right to rely as against the corporation.

2. If upon the faith of a regularly issued stock certificate, a purchaser or pledgee of stock, which in fact has been fraudulently and collusively issued by officers of the corporation, advances money or parts with anything of value, the corporation is bound by way of estoppel, to indemnify him to the extent of his expenditure, against loss in consequence of the falsity of the certificate.

3. A holder of such a certificate, who has received it as collateral security for a pre-existing debt from the person in whose name it was fraudulently issued, being uninjured by the falsity of the statements which it contains, has no claim upon it which he can enforce against the corporation.

4. Such a certificate is worthless, as a certificate, and gives no rights of its own force. A transfer thereof passes to the transferee no right or claim to shares of stock. The only right which can exist upon it, as against the corporation, is created by the act of parting with a valuable consideration in reliance upon its statements.

5. When such a certificate is given in pledge, the thing pledged is not shares of stock, but merely a right to call upon the corporation for indemnity against any loss suffered in consequence of reliance upon its representation that the person therein named is the owner of the shares therein mentioned.

6. If a fraudulent certificate is pledged by one who has no claim to indemnity thereon, and the pledgee receives, in settlement of his claim to be indemnified for his advances made on the pledge, genuine shares of stock, surrendering the spurious shares so pledged, such genuine shares do not become a substituted pledge in his hands, but are his absolutely.

7. Wherefore, a pledgor of such certificate, who has himself no claim to be indemnified thereon, is not entitled to recover from his pledgee who advanced money to him on the faith of it, any part of what the latter may have received from the corporation upon his claim for indemnity, although such claim may have been paid in genuine shares which afterwards increased in value to an amount exceeding the debt of the pledgor to the pledgee.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 344 January Term 1888, Sup. Ct.; court below, No. 259 September Term 1883, C. P. No. 3 in Equity.

On September 17, 1883, William T. Elbert filed a bill in equity against Josiah Kisterbock and the West Philadelphia Passenger Railway Company, which as subsequently amended averred:

That on March 18, 1876, the plaintiff gave to defendant Kisterbock three notes for $11,000 each, and, as collateral security for said notes, certificates for 300 shares of the capital stock of the said railway company belonging to the plaintiff; that said notes were renewed on August 9, 1877, and were then increased to $11,500 each; that the pledged certificates of stock had been surrendered to the railway company by Kisterbock, who received in lieu thereof certificates for a like number of shares issued in his name; that the plaintiff, by reason of financial straits, had been unable after the maturity of said notes to pay them or redeem said collateral; that defendant Kisterbock sometimes pretended that about the year 1880, though without notice to or the consent of plaintiff, he had exchanged said stock for other stock of the same company, representing a smaller portion of interest in the company than the stock originally pledged to him, and held said substituted shares as his own, without liability to account therefor; whereas, if such exchange were made, plaintiff was entitled, on the coming in of the evidence in this cause, to elect either to treat it as a wrongful conversion of the original pledge, or to treat the new stock as a substituted pledge ; that Kisterbock still held said renewal notes, and plaintiff needed discovery of their form and contents; that since the maturity of said renewal notes there had been sales of shares in the stock of said company made at $160 per share, and the present market value of the stock pledged to Kisterbock was greatly in excess of the principal and interest of said notes; that said Kisterbock received from the railway company dividends on said pledged stock amounting to $19 per share, and additional dividends since the filing of the original bill, and that other dividends might be declared before final hearing ; praying for an accounting between the complainant and Kisterbock, and for general relief.

To this bill, as amended, the defendant Kisterbock filed an answer in which he admitted the pledging of the 300 shares as collateral for three notes of $11,500 each, and that he still had the notes in his possession; also, that the present value of the stock exceeded the principal and interest of the notes, and that dividends had been declared thereon ; but he averred that the shares of stock transferred to him by the plaintiff were not genuine shares, but were part of a fraudulent over-issue made

by John S. Morton, the president of the company, without authority; that this over-issue had been made the subject of a bill in equity filed in the Court of Common Pleas No. 2 of Philadelphia, by Sarah Swain et al. against the railway company and its officers and directors, praying for an injunction restraining the company from making transfers or paying dividends upon said stock, and a decree for their cancellation; that the railway company filed in said cause a cross-bill against said Kisterbock and other persons who were holders of similar fraudulent shares, praying for a decree directing an inquiry as to who were claimants of the shares of the stock of said company, and that such claimants be required to establish their rights against the company; that in said proceeding it was decided that the holders of this stock were creditors of the corporation for as much money as they had actually paid for or on account of the shares held by them respectively, and the suit resulted in a decree in Kisterbock's favor, that he was entitled to be paid all the money he had advanced upon the pledge of the stock held by him, and which he had lost by reason of its fraudulent character; that at the time of this decree the debt for which he held said stock as security amounted, with interest, to over $40,000; that the market value of 300 genuine shares of stock at that time did not exceed $24,000; that in settlement with the company he received and accepted 300 genuine shares of stock, surrendering the fraudulent shares which had been pledged to him. The answer further averred that the complainant never advanced any money to John S. Morton upon the faith of said shares, and that he had no personal interest in the transaction set out in the bill, but had acted therein as the broker of John S. Morton, and had no right to any value said shares might have over and above the amount of said notes.

As a further defence, defendant Kisterbock set up inter alia, as cause of demurrer, that the complainant had an adequate remedy at law.*

Issue having been joined, the cause was referred to *Mr.*

---

* The answer of the other defendant, the railway company, and also a cross-bill filed by it against Elbert and Kisterbock, which was dismissed by the court below, are omitted from the report, because they are not necessary to an understanding of this appeal, and the issues raised by them as to the rights of the railway company are not involved therein.

Statement of Facts.

*Abraham M. Beitler*, as examiner and master, by whom the following facts were found, as shown by his report filed September 27, 1886:

Some time in or prior to 1876, John S. Morton, the president of the West Philadelphia Passenger Railway Company, by collusion with certain other officers of the company, caused to be issued a large number of fraudulent certificates of stock in said corporation. Included in this fraudulent over-issue were 300 shares, of which Morton subsequently transferred 200 to John W. Patten & Son, and the remaining 100 to Charles Lennig. In 1876, Morton delivered to William T. Elbert the certificates of those shares standing in the names of Patten & Son and Lennig respectively, accompanied by blank powers of attorney to transfer. Elbert executed three notes, to his own order, dated March 18, 1876, for $11,000 each, which he placed in the hands of W. M. Capp, a broker, together with the certificates for said 300 shares of stock, and the powers to transfer the same. Upon these notes Capp procured loans from Josiah Kisterbock, and as security therefor, delivered to him said stock certificates and powers to transfer. Thereupon Kisterbock had these shares transferred to his name upon the company's books. These notes were renewed from time to time, the last renewal being on August 9, 1877, when the amount of each was increased to $11,500. Prior to this renewal the fraudulent character of these shares had been discovered, and the suit in equity, mentioned in Kisterbock's answer to the plaintiff's bill, was instituted, to determine the status of the over-issued stock. There were then 3,437 shares of the capital stock, including 2,276 fraudulent shares in the hands of pledgees, who had received them mediately or immediately from Elbert. The railway company filed a bill in said suit against all the pledgees of fraudulent stock, as stated in the answer, without making Elbert a party thereto. Elbert's first knowledge of the proceeding, so far as appeared, was about the time the master's report in that proceeding was filed. The master therein reported that Morton was indebted to the railway company in several hundred thousand dollars; that there were outstanding 8,000 genuine shares and 9,207 fraudulent shares of its stock, and that the pledgees of the fraudulent shares, by reason of the operation of the certificates as an estoppel against the company, were entitled

to a decree against it for the inherent value of each share as the same was affected by the total issue, valid and invalid, which represented a claim against the corporation, and fixed this value at $75 per share. Arrangements having been made by the company for increasing its capital stock to 15,000 shares, without any increase in corporate assets, the master recommended a decree empowering the company, in lieu of the payment to the pledgees of $75 per share, to issue to such of them as were willing to accept, new certificates of stock in exchange for the fraudulent certificates held by them, provided that not more than 7,000 such new certificates be issued. Such a decree was made, and Kisterbock elected to take and did take 300 new shares in exchange for those that had been pledged to him, which he surrendered.*

Upon the issue raised in the present proceeding, as to Elbert's ownership of the stock pledged to Kisterbock, Elbert testified that in 1870, John S. Morton was indebted to him in a large sum; that shares of stock were given to him by Morton as collateral for this indebtedness; that Morton gave him other shares on which to raise money for him, Morton, and that he held all the stock given him, as collateral for the indebtedness owing from Morton, but had no written pledge thereof. The master's report contained no finding that Elbert was the owner of the shares pledged to Kisterbock, or had advanced any money therefor, nor any finding as to the existence of the indebtedness which the plaintiff testified was owing to him from Morton.

Upon the foregoing findings of fact, the master, following the ruling of the court below in Elbert v. Jeanes, 260 September Term 1883, in Equity, [see Jeanes's App., 116 Pa. 573,] held that the plaintiff was entitled to an account, and was to be credited with the value of the 300 shares of stock at the highest market price attained since the pledging thereof, to wit, $206.50 per share, with all the dividends thereon and interest, and was to be debited with the amount of the several notes with interest. He thereupon stated an account, finding that there was due to the plaintiff from Kisterbock, on August 10, 1886, a balance of $27,572.73, and recommended a

_____

* See Wright's App., 99 Pa. 425.

decree for the payment of this sum, and the surrender to the plaintiff of his three promissory notes for cancellation.

Exceptions to the report of the master were filed by Kisterbock, the tenth being as follows:

10. The learned master erred in deciding that the plaintiff was entitled to be credited with the value of the 300 shares of stock at the highest market price attained since the pledging thereof.

On January 26, 1888, after argument before the court in banc, the following opinion, REED, J., was filed:

The present case differs from the other suits brought by this plaintiff in the one important respect, that to enable himself to recover he has but to make out his title to the subject of the controversy, the shares, namely, of the capital stock of the West Philadelphia Passenger Railway Company. The defendant here has not sold, as did the other defendants, the shares pledged, and thereby incurred a loss of the difference between the proceeds of the sale and the amount of money lent upon the security of the stock. On the contrary, he still retains the latter, which in his hands has been and still is worth much more than the plaintiff's debt to him.

The only answer he can make to a demand for an account is to show that the plaintiff has no. title to the thing pledged, or that the plaintiff should have proceeded at law, or that he should have tendered the amount of the debt, etc., before bringing suit. On the question of jurisdiction, the ruling of the Supreme Court we regard as clear; for in none of the suits in equity, which, arising from these transactions, have been taken by appeal to that tribunal, has there been an intimation of a want of jurisdiction because of the remedy at law being adequate. In respect to the plaintiff's title, inasmuch as it is settled that the stock pledged by him was his when pledged, the defendant, the pledgee, must show how and when the title to it passed out of the plaintiff and became his, the defendant's. This, in our opinion, he has entirely failed to do.

The re-distribution of the stock, when it became necessary to ascertain the rights of the holders of genuine stock of the West Philadelphia Passenger Railway Company, and those of the holders of the over-issued stock, divested no titles and

created none, beyond the change which was involved in compelling the railway company to acknowledge as valid the fraudulent acts of certain of its officers. It is true, that the counsel for the defendant has cited the Supreme Court, in Jeanes's App., 116 Pa. 573, as ruling that Elbert, the plaintiff, had no equity, and has made in support of his view a quotation from the opinion of the court to the effect that Jeanes's Appeal was based substantially upon the same facts as five appeals taken by Elbert, and argues that the feature which these cases had in common could not have been the distribution made among themselves by the members of the firm of Isaac Jeanes and Co., as in fact there was no such distribution in the other cases, and insists that a want of equity on the plaintiff's part must have been what the Supreme Court had in mind. While the distribution, instead of a sale, which took place in Jeanes's case, was certainly thought by this court to be a violation of the contract of pledge, and was made the ground of a ruling in that case different from those which were made in the other cases by it, and by Court of Common Pleas, No. 2, yet as no allusion was made by the Supreme Court, to any want of equity on the plaintiff's part, it is easier to suppose that the court regarded the appeals as all showing a sale by the pledgee, and the distribution made by Jeanes & Co., followed by a sale, as being also such a sale, than to put any other interpretation upon their words.

The failure of the plaintiff to make a tender was another point in which all these claims put in suit by him are identical, and is one which it cannot be supposed was disregarded in Jeanes's Appeal and Elbert's Appeals. If no tender was necessary before bringing suit, the question next arises as to what is the measure of damages.

It is well settled that where after tender made of the debt, the pledgee refuses to deliver the pledge to its owner, or where, in the absence of notice to the latter he parts with the pledge, he is bound to compensate the pledgor in damages, to be measured by the highest price at which such stock or bonds (and the rule does not extend to every species of pledge), have been sold during the time in which the pledgor was wrongfully deprived of his property. While in the present case the stock has not been parted with, yet it is difficult to say at what point of

time any conversion has taken place, and upon a conversion is based the other rule of damages to be stated presently. A defendant asserting a lien upon a pledge, and a plaintiff claiming an account of his property, are not in the eyes of a chancellor like the parties in detinue or trover; and the principle, therefore, just suggested, namely, that the measure of damages is to be taken at the value of the pledge when it was converted to the pledgee's use, can scarcely be applied. The defendant's refusal to re-deliver the pledge without tender made him of the debt, cannot work a conversion, and clearly, for the purpose of this discussion, no such subsequent step in the pleading as the defendant's answer denying the plaintiff's title can operate to that end. There having been, then, no refusal to deliver the pledge after tender made, and no parting with it by the pledgee, the special measure of compensation first stated is not applicable, and in the absence of a conversion of the stock by the defendant, the general rule has no bearing.

If, however, we are right in our view of the case, there is another and more equitable disposition of it to be adopted, because, the parties being come into court for the settlement of an account, are neither of them strictly speaking in such default as to give rise to any judgment in the nature of a penalty. The plaintiff asks for an accounting and need, therefore, have made no tender, and the defendant, not having refused satisfaction after tender made, is to be held only to an adjustment of rights when such adjustment is ascertained by the court.

The plaintiff, then, is entitled to redeem his stock, and should he fail to do so in a time to be fixed, the same should be sold under the direction of the master, who will state an account of the proceeds and the rights arising in relation thereto. The exceptions Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12 and 13 to the master's report are dismissed. Exception 10 is sustained, and counsel will submit a decree drawn in accordance with this opinion.

A decree was thereupon signed, adjudging that the plaintiff was entitled to redeem his pledge of 300 shares of stock upon tendering to the defendant, within fifteen days from January 30, 1888, the sum of $33,351.55, being the amount of his indebtedness to Kisterbock, as of that date, less the dividends

which had been declared upon said stock, and interest thereon to the same date; that upon failure of the plaintiff so to redeem, said shares should be sold after thirty days' public notice, under the direction of the master, who should state an account on the basis of this decree, and adjust the rights arising in relation thereto.

Thereupon defendant Kisterbock took this appeal, specifying that the court erred:

1. In not decreeing a dismissal of the bill for want of merit.

2. In not dismissing the bill, by reason of the matter not being one cognizable in equity.

3. In decreeing payment of any sum by defendant.

4. In decreeing a sale of the shares of stock.

*Mr. John G. Johnson* (with him *Mr. William H. Lex*), for appellant:

1. Elbert had no right to hold the 300 shares of stock, fraudulently issued, as security for an antecedent indebtedness from Morton to himself, even if such existed, because the railway company was responsible for the fraudulent certificates only to the extent that value had been advanced on the faith of them. Beyond its liability to indemnify persons who had acted in reliance upon the representations · contained in them, they were worthless. If specifically pledged to Elbert for a past due debt, he could not have maintained any claim on them against the company, because not injured by any false representations made by it or its authorized agent. The utmost extent to which the receipt by Kisterbock of other shares, in settlement of the railway company's liability to him, could damage Elbert, was the amount of the notes secured by the pledged shares. By canceling such notes he would receive all he was entitled to. Moreover, Elbert had no right to compel the company to transfer the shares to him from Morton, the owner, or Kisterbock, Morton's pledgee, so long as Morton remained indebted to it. Having failed to receive a transfer upon the books of the company, he had no right which was valuable, and could not be injured by anything done by Kisterbock. Nor had Elbert any interest in any of the pledged shares, saving to the extent to which he had paid to Morton the proceeds of the discount of his notes, the amount of which proceeds was not

proven.   No antecedent debt by Morton to Elbert was established, and there was no proof of any pledge of these shares by Morton for any such indebtedness.

2.  The bill as filed disclosed no case within the jurisdiction of a court of equity.   It sought to charge the pledgee of stock, still remaining in his hands, with its value, although admitting that there has never been a tender of payment of the debt.   A pledgee is not bound in such circumstances to sell the stock, in order to give to the pledgor the benefit of an existing excess in the market value of the shares over the amount of the debt: Jones on Pledges, § 606.   Nor, under the evidence, could the bill be amended so as to present a cause within the jurisdiction of equity.   To entitle a pledgor to relief in equity, he must aver and prove some special ground, such as payment of the debt, or refusal to accept a tender thereof, or, that, by reason of the necessity for an account, only obtainable in a court of equity, he is unable to make a tender.   The only amendment of this bill that could be made under the evidence, would leave it a bill claiming damages and nothing else.   For these complainant has an adequate remedy at law: Conyngham's App., 57 Pa. 479.   Moreover, a chancellor ought not to decree specific performance of a contract to surrender pledged stock procurable on the market: Foll's App., 91 Pa. 437.   He should interfere only in two cases : where there has been a breach of trust, and where the articles pledged have a special value that cannot be replaced without great difficulty.

3.  The decree of the Court of Common Pleas No. 2 judicially ascertained the value of the shares at the time of the alleged conversion by Kisterbock, and restricted Elbert to a right to have credited against his debt that value alone.   As shares they were worthless, but the decree found that it was the duty of the company to make good as damages to Kisterbock their value, $75 per share.   Elbert cannot repudiate this proceeding, because such action would entitle him to nothing but the shares confessedly worthless.   Kisterbock's duty to him was honestly to prosecute the claim for damages against the company.   It is not pretended that this was not honestly done, nor that he did not secure the best obtainable decree.   The fact that he was given the option to take his damages in cash or in stock, and chose the latter, gives Elbert no right to the

benefit of a subsequent rise in value. And even if Elbert was entitled to object to Kisterbock's action, this right has been lost by laches, as he knew of the decree in favor of Kisterbock, and allowed years to pass without repudiating the latter's action under it: Hayward v. Bank, 96 U. S. 611; Colket v. Ellis, 10 Phila. 379; Rennyson v. Rozell, 106 Pa. 413; Baker v. Drake, 53 N. Y. 211 (13 Am. Rep. 507); Evans's App., 81 Pa. 278; Ashhurst's App., 60 Pa. 290; Neely's App., 85 Pa. 387. In no event is Elbert entitled to a decree for a greater amount than the balance which would be due him on the basis of the value of the shares at the time when, by his bill, he acquiesced in the conversion. The bill treats them as converted in 1880. The rule of damages in this state is well settled: Neiler v. Kelley, 69 Pa. 403; Work v. Bennett, 70 Pa. 489. The rule is the same in equity as at law: Baker v. Drake, 53 N. Y. 211 (13 Am. Rep. 507). The tendency of the decisions is toward limiting the rule awarding high damages: Huntington etc. R. & C. Co. v. English, 86 Pa. 247; North v. Phillips, 89 Pa. 254. Although the court set aside the action of the master in awarding Elbert the highest value of the stock up to the time of the decree, it has done the same thing in effect by ordering a sale of the stock, as the market price is now higher than ever before.

*Mr. F. Carroll Brewster* (with him *Mr. F. H. Cheyney*), for appellee:

1. Under the equity proceedings in Common Pleas No. 2, Kisterbock, as the record conclusively shows, received the 300 new shares as a simple substitution for the old ones originally pledged, still retaining the notes which were the foundation of the pledge. The right of a pledgee is strictly confined to a sale; he cannot appropriate the pledge to himself on default of the pledgor, even under an agreement that on such default it shall become irredeemable, such agreement being void: Story on Bailm., § 318; Mackeldy on Roman Law, p. 277; French Civil Code, § 2078. In this case, there having been no sale, Elbert's title to the stock, qua stock, has never been legally divested. The argument that Elbert had no right to take and hold the stock in pledge for an antecedent debt due him by John S. Morton, can have no application whatever. It is no business of the pledgee what Elbert paid for the stock pledged,

provided he did not steal it or no one else proved a better title to it, and the only parties claiming this stock are the pledgor and pledgee. There is no proof that Elbert knew of Morton's fraud, or had any complicity therewith. He produced accounts before the master which are a part of the record, but which appellant did not print, showing vouchers for every cent of money paid by him for account of John S. Morton, covering all moneys raised by him upon the 3,437 shares of stock which he pledged to the appellant and other persons.

2. The bill in this case was for an account. The plaintiff did not know how much he ought to tender in order to redeem, and therefore no tender was possible. This fact settles the jurisdiction of equity. Tender was not a prerequisite: Conyngham's App., 57 Pa. 474. It would have been a vain thing, at any time after suit brought, to have made a tender, even had plaintiff known what amount of dividends had been declared upon the pledge, for the defendant refused to account for it, denied the jurisdiction of the court to make him account, and asserted ownership of the stock in himself. As to the question of the alleged laches of Elbert in filing his bill, the cases cited by appellant have no bearing upon the present case. In Neiler v. Kelley, 69 Pa. 403, the opinion states that the general rule confining the damages in trover to the value of the goods at the time of conversion, may be considered as modified as to stock, railroad bonds, etc. In Huntingdon etc. R. & C. Co. v. English, 86 Pa. 247, and North v. Phillips, 89 Pa. 254, this modification was said to apply where the parties bear to each other a trust relation. There can be no higher species of a trust than a pledge, and the principles laid down in Bank v. Reese, 26 Pa. 143, and Conyngham's App., 57 Pa. 474, under which stock pledged and converted or improperly sold by the pledgee, must be accounted for at the highest price it attained in the market at any time afterward, govern this case. Kisterbock's denial of Elbert's ownership amounted to such a conversion as to render him liable to account at this rate.

OPINION, MR. JUSTICE GREEN:

Undoubtedly, the overshadowing, controlling question in this case is, the character of the plaintiff's title.

Certainly the relation of pledgor and pledgee was intended

to be created by the original transaction between the parties. We should have no difficulty in enforcing the pledge in this proceeding and in accordance with the decree of the court below, if the proper conditions existed with relation to the substance of the pledge. The case is quite peculiar, not to say without parallel, in its facts.

The plaintiff had possession of two papers which purported to be certificates of stock of the West Philadelphia Passenger Railway Company, one for two hundred and the other for one hundred shares. The former was issued in the name of John W. Patten & Son, and the latter in the name of Charles Lennig. These certificates the plaintiff pledged to the defendant as collateral security for the payment of three notes, made by himself, payable to his own order, each for the sum of $11,500. The actual transaction was made by one Capp, who borrowed the money from the defendant and delivered to him the notes of Elbert and the certificates. The money was borrowed and the notes and certificates delivered in 1876, and the notes were renewed from time to time. The certificates were transferred early in 1876, on the books of the company, into the name of the defendant, and continued to be held by him. In September, 1877, it was discovered that these certificates along with a large number of others, had been fraudulently issued by John S. Morton, the president of the company, and that they were altogether false and spurious. The plaintiff being utterly insolvent neither redeemed them, nor at any time offered to pay any part of the debt.

Upon proceedings instituted against the company, it was determined that as against persons who had paid for the stock, or advanced money upon the faith of it, the company was estopped from denying its legality, and was bound to either issue genuine shares, or pay value for those which were false. The court in which those proceedings were conducted specially decreed that Josiah Kisterbock was entitled to receive certificates for 300 genuine shares of the stock, or, in case of his refusal to take shares, he could take $75 per share in money for the spurious shares held by him. He elected to take the 300 shares, and did so, and it is these shares which the plaintiff claims to have decreed to him upon payment of the debt and interest due to Kisterbock. The latter claims they are

his absolutely without liability to account to the plaintiff for anything connected with them.

It is entirely undisputed that the plaintiff never bought these shares, and that when they were pledged to Kisterbock he alone advanced all the money that was advanced upon them and on the faith of their genuineness.

It has not been found as a fact by the master, in the present case, that the plaintiff was ever the owner of these stocks, or that he ever paid any money for them or advanced any money on them to Morton or to any other person. The plaintiff alleged that there was a large balance of account due to him by Morton from the year 1870, and that he received these shares, or was entitled to hold them as security, for the payment of that indebtedness and of other and further indebtedness due upon an accounting. But he also alleged and testified that he borrowed money for Morton on the shares of West Philadelphia Railway stock, giving his own notes, and pledging the certificates of stock as collateral. The whole subject of these transactions, and of Elbert's claim, both as a creditor of Morton upon an accounting, and as a lender of money to Morton upon faith of these stocks, was thoroughly and most fully considered and decided by the master in the present case, when acting as master in another case, in which Elbert claimed to recover for the value of shares of stock in the same company pledged to Isaac Jeanes & Co. The master then reported that there was no sufficient evidence before him to prove the alleged indebtedness of Morton to Elbert, and he ruled that if the false stock certificates were delivered to Elbert as security for an antecedent debt, he was not a holder of them for value. The master further held in that case that the true subject of the pledge was, not shares of stock, but a right to be indemnified for the fraudulent acts of the company's officers, and, even conceding that the plaintiff had an interest in the stock, to that extent it passed to Jeanes & Co. when they advanced money on the faith of the stock, and that it was fully asserted and availed of by them. The master also held that the new shares issued to Jeanes & Co. were lawfully disposed of by them under powers contained in the pledge, without liability to account to Elbert, and he therefore recommended a decree dismissing the plaintiff's bill. On excep-

tions filed, the master's report was overruled by the Common Pleas and the plaintiff was held to be entitled to a recovery.

While the record of that case was in that condition the present case came before the same master, and in obedience to the decree of the court in the Jeanes case he declined to sustain his own views, but reported that the plaintiff was entitled to a decree, because the Court of Common Pleas had so decided in the case of Jeanes. Since then, however, this court sustained the master's report in that case and reversed the decree of the Common Pleas: Jeanes's App., 116 Pa. 573. We, however, then considered but the one question of the power of the pledgees to sell the pledge and the lawfulness of its exercise. That question does not arise in this case, as the pledgee here still holds the new shares of stock issued to him in exchange for the false shares received from Elbert.

Upon a present examination of the report of the master in the Jeanes case we fully approve the views expressed by him as to the true character of the pledge. It was not a pledge of shares of stock, but simply of a right to receive indemnity for the fraudulent acts of the officers of the railway company in issuing the spurious shares. The master in thus regarding the subject simply followed the ruling of this court in the case of Mount Holly Paper Co.'s App., 99 Pa. 513, in which SHARS-WOOD, C. J., speaking of the right of the pledgees of certain other false shares of the stock of this same West Philadelphia Passenger Railway Company by the same John S. Morton and other officers of the company, said: "Their claim on the company was not, indeed, on the stock. It was a claim to be indemnified for the fraudulent acts of the officers of the company from which they allege that they have suffered damage." In the original proceeding in the suit of Swain et al. v. The West Phila. Pass. Railway Co., the master based his report upon the proposition that, "the liability of the railway company arises on the principle of estoppel which the necessities of trade and commerce require. Stock certificates issued by a corporation having power to issue, are a continuing affirmation of the ownership of the special amount of stock by the person designated therein or his assignee, and the purchaser has a right to rely thereon and claim the benefit of an estoppel in his favor as against the corporation;" citing Holbrook v. Zinc Co., 57 N. Y.

616; Willis v. Darby Railway Co., 6 W. N. 461; Bahia & San Francisco Railway Co., L. R. 3 Q. B. 585; Bank of Kentucky v. Bank, 1 Pars. Eq. 180. Undoubtedly this is the correct principle upon which to administer relief in all such cases.

This being so, it will be seen at once that the right to relief depends upon the equity of the person claiming it. If he has expended money upon the faith of the official certificates of the officers of the company, he has a right to be indemnified, to the extent of his expenditure, against loss from false certificates, but only because of the fact of his expenditure. The false certificates are no certificates in legal contemplation, and give no rights of their own force. But the act of the officers in issuing them, having been accepted and acted upon by another, the company cannot be heard to deny the truth of the fact represented. It is simply the application of the principle well expressed in Freeman v. Cooke, 2 Exch. (Welsb., H. & G.), 654, and In re Bahia & San Francisco Railway Co., supra, that, "If you make a representation with the intention that it shall be acted upon by another, and he does so, you are estopped from denying the truth of what you represent to be the fact." But if what was pledged by Elbert to Kisterbock was not shares of stock, but a right to indemnity on account of a good faith advancement of Kisterbock's own money, made by Kisterbock himself, it is difficult to understand upon what principle the plaintiff is entitled to any recovery upon any view of the facts of this case. There is no finding on this record that Elbert ever owned or bought or paid a dollar of money for these particular shares of stock. They were not even prima facie his, as they were issued in the names of other parties and were transferred into the name of Kisterbock immediately after he received them. Elbert was himself examined and cross-examined as a witness at great length. But he gave no testimony as to his acquisition of these particular shares which were delivered to Kisterbock, nor to any of the facts of the transaction. He said he received very many shares from Morton, that those he received in 1870 were as security for the indebtedness due him by Morton, and that he also received shares upon which to borrow money for Morton. He had no written pledge of any of the shares nor could he state any oral pledge of the same. At the end of a long examination on this subject he

was asked: " Q. Then all the pledge that ever was made, there being no written pledge, orally, was by giving stock in the way that the stock was given? A. Yes, sir." In answer to another question he said, " I held all that stock as collateral for indebtedness to me." This was 2567 shares including the 300 of Kisterbock and all designated in a letter of January 11, 1877, from Morton to him.

There is no finding that Elbert ever advanced any money on the shares delivered to Kisterbock, either to Morton or to any one else. There is not even a finding that they were delivered to Elbert as security for an antecedent indebtedness due by Morton to him, or even that there was such indebtedness. But if there had been such a finding, or if such had been the fact, Elbert would not have been entitled to any relief on that account as against the company, because, in that event Elbert parted with nothing on the faith of the certificates, and he would fail to bring himself within the principle upon which alone indemnity could be given, or was in fact given, when the decree was made in the case of Swain et al. v. the company. Even granting that because Elbert gave his own notes for the money borrowed from Kisterbock, and therefore had an interest equal in extent to that of the latter, it was the advancement of money and not the giving of notes which conferred the right to indemnity, and all the relief that could be given, or was given for that cause, was actually and properly given to Kisterbock.

There could not be a right to indemnity to Kisterbock and a further right to indemnity to Elbert arising out of the same transaction. Most clearly Kisterbock was entitled to it, but when it was given to him equity was satisfied ; the subject was exhausted. Elbert could suffer no injury on account of the notes, because Kisterbock held them, and he having accepted the new shares in full payment of the debt for which the notes were given, of course could recover nothing from Elbert. Kisterbock had the alternative of accepting seventy-five dollars per share in money for the false shares, or instead thereof three hundred new and genuine shares. Had he accepted the money it would have been an end of the matter and the present case would never have been heard of. But he chose to accept shares instead of money. Why should there be any difference

to him in the result of his accepting one or the other of the alternatives? What he took, and what he had a right to take, was indemnity, such indemnity as the law could give him. But it was his, not Elbert's; his absolutely, not conditionally. It was personal to himself, not because of the certificates which he received from Elbert, but because he, as an individual, had parted with his own money upon the faith of certifications made by the officers of the company, the truth of which certifications the company could not be permitted to deny as against Kisterbock. This was something which never belonged to Elbert and which he never passed to Kisterbock. If Kisterbock had never advanced the money, he would never have held this right to indemnity, even though he might have held the false certificates.

It follows that the trust which is a quality of pledge, and goes with it ordinarily, did not go with, and never attached to, this right to indemnity. It was a right which only came into existence in favor of Kisterbock, not by force of the pledge, but by force of his good-faith advancement of his own money. It was never clogged with any trust in favor of Elbert, because the fact upon which alone it was founded had no existence with Elbert, or in his favor, or in consequence of any money or property parted with by him. It was the money which Kisterbock parted with, which *created* the right to indemnity, and that money was his alone, and its advancement was the sole basis upon which the decree was made in the original case. These views are radical and reach to the very foundations of the plaintiff's claim of title to equitable relief. They are in hostility with such claim and require a reversal of the case upon its ultimate merits.

> The decree of the court below is reversed at the cost of the appellee, and the bill is dismissed with direction that all the costs of the case be paid by the plaintiff.

On November 4, 1889, a motion for a re-argument was refused.