COPPER KING MINING CO. v. HANSON et al. (ROLLEY et al., Interveners).

No. 3268. Decided Nov. 23, 1918. (176 Pac. 623.)

1. CORPORATIONS—RESOLUTION FOR SALE OF STOCK—CONSTRUCTION—AGENCY. A resolution of corporation's directors naming its president as agent to secure sale of treasury stock to raise funds to pay debts must be construed from a reading of the resolution in the light of existing circumstances. (Page 610.)

2. EVIDENCE—ACTS OF DIRECTORS—ORAL TESTIMONY. Any act of the board of directors of a corporation may be proven by oral testimony upon showing that no record was made of such action, or, if a record was made, that it has been lost. (Page 610.)

3. CORPORATIONS—AGENCY—TERMINATION—RESCISSION BY IMPLICATION. Where a board of directors by a resolution authorized the corporate president as agent to sell treasury stock for payment of

debts, and without express rescission thereof subsequently provided another method of paying debts, there was an implied rescission of the resolution and termination of the agency.   (Page 611.)

4. CORPORATIONS—POWER OF PRESIDENT—AUTHORITY TO SELL STOCK. The president of a corporation ordinarily has only the powers of a director, or such additional powers as may be directly conferred upon him by the board of directors, who are the real corporate managers, and he has no implied authority to sell treasury stock in view of Comp. Laws 1907, Section 324.   (Page 612.)

5. CORPORATIONS—CANCELLATION AND SURRENDER OF STOCK—EQUITY JURISDICTION.   Where corporate stock was wrongly issued and without authority, upon corporation's suit therefor and offer to save defendant holders from loss, a court may, under equity rules, cancel the stock, direct its surrender, and repayment of money paid for stock.   (Page 612.)

6. CORPORATIONS—SUIT TO CANCEL STOCK—CONSPIRACY—EVIDENCE OF SALE PRICE OF STOCK.   In a suit to cancel stock alleged wrongly issued by the president in conspiracy with purchasers to gain control of the corporation, evidence that the stock was sold far below its real value is material.[1]   (Page 613.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. Wm. H. Bramel,* Judge.

Action by the Copper King Mining Company, a corporation, against A. M. Hanson and others, to cancel stock certificates, in which Stanton Rolley and others became defendant interveners.

From a judgment of nonsuit plaintiff appeals.

REVERSED, with directions to reinstate the case and try it upon the merits.

*Moore, Mitchell & Maginnis* and *George C. Buckle* for appellant.

*J. E. Johnson, E. O. Leatherwood* and *Jay H. Stockman* for respondents.

GIDEON, J.

---

[1]*Lochwitz* v. *Mine & Milling Co.*, 37 Utah, 349, 355, 108 Pac. 1128.

Plaintiff seeks by this action to compel the surrender for cancellation of two certificates of stock for 7,500 shares each, held respectively by the defendants A. M. Hanson and C. W. Winder and numbered respectively 185 and 186. It is alleged in the complaint that the stock was issued wrongfully and without authority by one Roderick W. MacDonald, president of the plaintiff company, and further that said certificates are not signed by the proper officers of the corporation; that the same are void and of no effect; and that such certificates were issued without authority or knowledge of either the board of directors or the stockholders.

The answer admits the issuance of the certificates, but denies that they were wrongfully issued, and claims that the same were issued under resolution of the board of directors passed on the 22d day of February, 1916, and, further, that the said defendants are innocent purchasers and paid a valuable consideration for said stock, and prays judgment that the same be declared legal and valid stock in the corporation, and that they be entitled to all the privileges and benefits of other stockholders in said company.

Hearing was had before the court, and at the close of plaintiff's testimony the court sustained a motion for a nonsuit and entered judgment dismissing the action. Plaintiff appeals.

The minutes of a regular directors' meeting held on the 23d day of February, 1916, at which the president of the company and the other directors were present, show that the following proceedings were had:

"Meeting called to order by President MacDonald. Present were: MacDonald, Fuelling, Rolley, Andrew, Van Alstine, Frankel. President MacDonald stated the object of the meeting is to devise means to pay off the obligations and expense for the ensuing year. Minutes of the last meeting read and approved. All bills presented for legal services and filing fees were ordered paid, also the bill of the Park Record. Balance of bills were tabled and laid over for our further meeting.

"It was finally discussed among Fuelling, Andrew, Mac-
Donald and Van Alstine to dispose of a certain amount of
treasury stock, and Van Alstine moved that we place 50,000
shares of the treasury stock on the market at five cents net, or
as much more as we can obtain, and that Mr. MacDonald be
given full authority to place the stock on the market with
some reliable brokerage firm or some mining promoting firm,
and to use his best judgment in the matter. The same was
seconded by Fuelling. Mr. Rolley made an amendment to
the motion, but being no second the same was lost and the
original motion was carried."

It appears that subsequently, some time in April, 1916, a
meeting of the directors was had of which no written minutes
were kept and at which meeting the president, Mr. Mac-
Donald, reported that he had consulted several brokers in Salt
Lake City and was advised that such brokers were overloaded
with stock and that they were unable to sell the stock of this
company at any price. At a later date, on or about July 18,
1916, a directors' meeting was had at which the president,
Mr. MacDonald, presided. At this meeting a Mr. Pratt sub-
mitted a proposition to the board to dispose of the company's
holdings at a price named, and a thirty days' option was
given with a provision for fifteen days' additional if any
sale of consequence was pending. At the same meeting the
secretary called the board's attention to a note due and other
expenses, and thereupon that subject was postponed for a
later meeting.

Mr. MacDonald, president, was present and presided at a
special meeting of the directors on September 1, 1916, at
which meeting he (MacDonald) stated that the object of the
meeting was "to raise money to pay the note and other inci-
dental expenses and current bills the company owed." At
that date an assessment of one cent per share was made upon
the stock, to create a fund to pay the expenses for the year
1917, and it was decided that the assessment should be paid to
the treasurer of the company at once and any stock delinquent
would be advertised for sale October 1, 1916, and sold Novem-
ber 1, 1916. Subsequently, on October 24, 1916, another

special meeting of the directors was held at which the president, Mr. MacDonald, was present. The meeting was pursuant to a request of Mr. Rolley, one of the directors, and he was called upon to explain the reason for the meeting. Mr. Rolley stated that he had visited Salt Lake City for the purpose of disposing of the holdings of the plaintiff company; that all shareholders would derive an even benefit from the sale; that he had a buyer and asked that he be given authority and an option until December 1st to sell such holdings for $37,500. The directors gave him such option and extended the time until January 1, 1917. At a subsequent meeting of the directors on November 14, 1916, the secretary and treasurer reported that they had paid all bills of the company, and such action was ratified by the board. Some additional money remained in the hands of the treasurer, and he was directed to place $200 of the amount at interest, in a bank named, and deposit the balance in an open or checking account. At that date Mr. Julius Frankel, secretary of the company, advised the directors that he expected to be absent from the city and would not be able to send out notice of the stockholders' meeting. President MacDonald agreed to act as secretary pro tem, during the absence of Mr. Frankel. Thereafter, on or about April 20, 1917, the president, MacDonald, issued and delivered the stock in question to the defendants and received in payment from defendants five cents per share, or a total of $750.

The articles of incorporation provide that the annual meeting of the stockholders shall be held on the third Monday in January of each year at the general office of the company at Park City, Utah. No meeting was, however, held at that date in 1917. A special stockholders' meeting was called and met on April 23, 1917, at which time the other directors, for the first time, learned that the defendants held stock in the company or that any stock had been sold by the president. At that meeting MacDonald represented the stock sold to defendants by written proxy. At a later date the directors repudiated the action of the president in selling the stock in

question and authorized the bringing of this action for the cancellation of the certificates.

Three questions are presented for determination: (1) Did the president, Roderick W. MacDonald, have authority under the action taken by the board of directors in February, 1916, to sell the stock in question? (2) If not, did he have such authority by reason of the fact that he was president of the plaintiff company? (3) Are the defendants such bona fide purchasers as will estop the plaintiff company from questioning in a court of equity the validity of the stock issued where plaintiff offers to return to defendants all amounts expended by them?

An examination of the minutes of the meeting of February 23, 1916, will show that the purpose of offering any part of the treasury stock was to obtain money to pay the obligations of the company and the expenses for the ensuing year. We need not discuss or determine whether, under the particular wording of the minutes of that meeting, the president was given authority to personally sell the 50,000 shares of stock or any part thereof, or, merely to place the same with some reliable broker, as we are satisfied that whatever authority was given to him at that date was canceled or recalled by the subsequent actions of the directors, participated in by MacDonald. The effect of the action of the directors was to name the president the agent of the company to do the acts mentioned in the resolution. Such authority is controlled and governed by the same rules applicable to contracts between individuals. The intent of the parties must be gathered from the reading of the resolution interpreted in the light of the circumstances and reasons existing for it at the time. 2 Fletcher, Cyc. Corp. section 921.

Acting in conformity with the power given him, the president attempted to place the stock with certain brokerage firms, but ascertained that there was no sale for stock of that nature, and so reported to the directors at a meeting held some time in the early part of April of the same year. It is true no record was made of that meet-

ing, but the action or proceedings were shown by oral testimony at the hearing, which may be done in a proper case.

"Any act of the directors may be proven by oral testimony, when it is shown that no record was made of such action, or when it is shown that if such record was made it has been lost." 3 Cook on Corp. (7th Ed.) Section 714, p. 2471.

At the subsequent meetings of the directors, after April, 1916, no reference is made to the authority given to the president to sell part of the treasury stock. Efforts were made to sell, and propositions for the sale of the entire property were considered and acted upon. At the meet-       3
ing of September 1st, recognizing the necessity of having money to pay the indebtedness and incidental expenses, an assessment was levied, and, as shown by the records of subsequent meetings, the indebtedness was paid and a balance was left in the hands of the treasurer. By the assessment the very purpose or object for which the president was authorized to sell the treasury stock was removed, and the reasons why that authority was given no longer existed. All of these facts were known to the president, and all the actions of the directors were participated in by him. While it is true that there was no express rescission of the action taken by the directors at the meeting in February, 1916, there was, by necessary implication, a rescission of any authority given the president at that time. New and additional action was taken relating to the same subject-matter and for the accomplishment of the same object. Such action was in effect a rescission of any former agreement between the parties respecting the same subject-matter. 6 R. C. L. par. 307, p. 923. We must therefore conclude that any authority given to the president of the company to sell the stock, by the action of the directors of February 23, 1916, was canceled and repealed by the subsequent acts of the directors, which acts were participated in by Mr. MacDonald.

Respecting the second question: It has been determined by this court that under Comp. Laws Utah 1907, section 324, the president of a corporation ordinarily has only the powers of a director, or such additional powers as may be directly

conferred upon him by the board of directors.
*Lochwitz v. Mine & Milling Co.*, 37 Utah, 349, at page
355, 108 Pac. 1128; 3 Cook on Corp. (7th Ed.) par. 716, p.
2473.

''While it is true that the president or general manager of a corporation sometimes exercises quite extensive powers in the executive management of its business, he is, nevertheless, acting all the time under the express or implied authority of the directors, who are the real managers of the corporation. He has no implied authority to sell treasury stock.''
*Camden Land Co.* v. *Lewis*, 101 Me. 98, 63 Atl. at 531.

Having determined that the president had no express authority to issue the stock in question, and also that he has no such implied authority, it necessarily follows that the right of the defendants to be protected in their purchase depends upon the justice or equity of their claim. Plaintiff brought its action in a court of equity alleging the issuance of the stock without authority and tendered to the defendant all the money that they had paid for such stock; in other words, it offered to do equity. The plaintiff, being without wrong so far as this particular transaction is concerned, in asking to be repossessed and restored to its property which had been wrongfully issued, tendered and offered to return to the defendants everything of value with which they had parted. I entertain no doubt that, under well-settled rules of equity, under such a state of facts, in view that the plaintiff offers to save the defendants from loss, a court has the power to cancel the stock and direct its surrender, and to direct the repayment to the defendants of such moneys as they had paid and which were converted into the treasury of the plaintiff company.

''This being so, it will be seen at once that the right to relief depends upon the equity of the person claiming it. If he has expended money upon the faith of the official certificates of the officers of the company, he has a right to be indemnified to the extent of his expenditure against loss from false certificates, but only because of the fact of his expenditure. The false certificates are no certificates in legal contemplation, and give no rights of their own force. But the act of the officers in issuing them having been accepted and acted upon by another, the company cannot be heard to deny the truth of the fact represented.'' *Appeal of Kister-*

*book,* 127 Pa. 601, 617, 18 Atl. 381, 383, 14 Am. St. Rep. 868, at page St. Rep. 651.

See, also, 5 Fletcher, Cyc. Corp. par. 3497.

The court refused to permit the plaintiff to prove the reasonable value of the stock in question, and that ruling is assigned as error. As a retrial of the action is necessary, it is desirous that this court express its views upon that ruling.

Merely proving the value of the stock, alone, might or might not be sufficient to prove a conspiracy between the president of the company and the defendants; but at least it is an element which should be considered in determining the fact of a conspiracy, if such existed. It is in the record that the issued and outstanding stock of the plaintiff company was something between 40,000 and 50,000 shares, and, as the property was under option for sale at something like $37,500, it can readily be seen that the value of the shares of stock sold was largely in excess of the price received. It may well be that, where the amount received for stock is so disproportionate to its real value, that fact should be accepted as conclusive evidence of a conspiracy between the purchaser and the officer selling the stock without authority and as claimed in this case, with the object of obtaining control of the corporation.

It follows from the foregoing that the case must be reversed, with directions to the lower court to reinstate the case and proceed to try it upon its merits. Apellants to recover costs.

FRICK, C. J., and McCARTY, CORFMAN, and THURMAN, JJ., concur.