**John BUXTON et al.,**
**Plaintiffs–Appellees,**

v.

**DIVERSIFIED RESOURCES CORPORATION,**
**Defendant–Appellant.**

**No. 79–1404.**

United States Court of Appeals,
Tenth Circuit.

Argued Oct. 15, 1980.
Decided Nov. 25, 1980.

Larry G. Reed and LeRoy S. Axland of Suitter, Axland & Armstrong, Salt Lake City, Utah, for defendant–appellant.

Richard K. Crandall and Adam M. Duncan, Salt Lake City, Utah, for plaintiffs–appellees.

Before McWILLIAMS, BREITENSTEIN and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The question presented in this appeal is whether Diversified Resources, the appellant, is liable for a debt in the amount of $20,000 for a loan made by the plaintiff–appellee John Buxton, or whether the action by Buxton is barred by the statute of limitations.

### The Essential Facts

The predecessor companies to Diversified were U.S. Silver and Mining Corp., U.S. Copper Corp., and Mojave Uranium Corp. Buxton's son, Robert J. Pinder, was president of Diversified and its predecessor companies for more than ten years prior to 1972. Pinder was also Chief Executive officer and managing agent of the companies. According to the testimony of Buxton, the loan was made to the company because of his son's connection with it, and because of an emergency request. Buxton also testified that a note was executed to secure repayment of the loan. However, the note has been lost, if one existed. Buxton was able to produce his cancelled check in the amount of $20,000.

Robert Pinder attested in an affidavit that the loan was made. Ray Jepperson, Controller for Diversified, attested to the fact that the debt in the amount of $20,000 was carried on the books of Diversified from May, 1970 through all of 1972. Jepperson also stated in his affidavit that the loan was not paid during the period mentioned. There was testimony given in a deposition by Rex Frazier, a Certified Public Accountant with Touch, Ross and Co., which company had been engaged to audit the financial statements of U.S. Silver and Mining Co. and Diversified from 1969 through 1976, that the corporation records revealed a $20,000 debt to Buxton from 1971 through 1975.

There was a series of audit letters which were introduced into evidence. These were mailed to Buxton by Diversified and they referred to a debt owed by Diversified to Buxton amounting to $20,000. Starting in 1971 the letters stated that the auditors were making an examination of the records, and that the records indicated that the company was indebted to Buxton on notes in the aggregate amount of $20,000. The letters sought a confirmation of the accuracy of these statements. The earlier letters were signed by Ray Jepperson, Controller of the Corporation. In the years 1974 and 1975 the company's audit letters stated that the auditors were making an examination of financial statements which indicated the following amount payable to Buxton on notes [$20,000 plus interest]. The letters sought a confirmation of the accuracy of the above information, the same to be communicated to, the auditors. The letters were signed by William Wallace, President of Diversified. It is the position of Buxton that the audit letters represented that the corporation acknowledged its debt to Buxton, and that because of his reliance on those representations Buxton withheld attempting to collect the debt.

Diversified's basic assertion is that the applicable Utah statute of limitation bars this action by Buxton. Specifically it is contended that Section 12–44 of the Utah Judicial Code (78–12–44 U.C.A.) is applicable. This section provides:

> *Payment–Acknowledgment–Promise to pay extends* period.–In any case founded on contract, when any part of the principal or interest shall have been paid or *an acknowledgment of an existing liability, debt or claim* or any promise to pay the same, shall have been made, an action may be brought within the period prescribed for the same after such payment, acknowledgment or promise; but such acknowledgment or promise must be *in writing, signed by the party to be charged thereby* . . . . (Emphasis added).

The district court held that the audit letters were indeed acknowledgments within the meaning of the statute and therefore they serve to toll the running of the Utah statute of limitations. The district court further ruled that communications signed by the corporation estopped it from asserting that the Utah statute of limitations operated as a bar to Buxton's claim. The court also held that there was no genuine issue of material fact and that Buxton was entitled to judgment as a matter of law. Accordingly a summary judgment for Buxton was awarded and entered.

## The Contentions

Diversified has appealed the award of summary judgment on four grounds:

1. That neither Jepperson or Wallace had authority to bind the corporation by signing audit letters;

2. That the audit letters do not constitute acknowledgments within the meaning of U.C.A. section 78–12–44 quoted above;

3. That Diversified may not be estopped from asserting the statute of limitations as a defense to this action;

4. That a genuine issue of fact exists as to whether the alleged $20,000 loan by Buxton was repaid by the corporation.

## I.

### Did the President Have Authority to Sign Audit Letters Acknowledging the Debt?

■ The first argument presented by Diversified is that there is a material question of fact as to whether the President, Wallace, had authority to bind the corporation to an acknowledgment of the debt to Buxton by merely signing the audit statements. While in some cases there would be a question as to the extent of the President's authority and as to whether that issue would constitute a triable issue of fact, *Knox v. First Security Bank of Utah*, 196 F.2d 112 (10th Cir. 1952), there is no triable question in the case at hand. Here the trial court was not faced with the question of the presence of authority to enter into contracts on behalf of the corporation or to dispose of property of the corporation or to write letters to third persons purporting to bind the corporation. Rather the court was

faced with the simple question of whether the President had the authority to sign routine audit statements on the company in the ordinary course of his business and to acknowledge the information contained in those statements.

It is true that in Utah the President has only the powers of a director or those powers directly conferred upon him by the Board of Directors. *Copper King Mining Co. v. Hanson*, 52 Utah 605, 176 P. 623 (1918); *Passow and Sons v. Wetherbee, et al.*, 50 Utah 243, 167 P. 350 (1917). If we had to be concerned with the question of the President's having power to contract or to dispose of corporate property or bind the corporation by single act, we would perhaps have a question of fact and one of law as well. However, the rules governing the scope of an agent's authority apply to the officers of a corporation just as they do to the agents of a private individual. *See* 19 W. Fletcher, Cyclopedia of the Law of Private Corporations § 437 (perm. ed. Fletcher Cye Corp., Kilcullen rev. 1975); *Carlquist v. Quayle*, 62 Utah 266, 218 P. 729 (1923), reh. den. 1923. Under the fundamental rules of agency expounded in Fletcher and Mecham the authority of an officer of a corporation may be implied from his conduct and from the acquiescence of the directors. Id. at p. 498. Mecham in his Law of Agency states that authority may be implied from the circumstances of the case as long as that authority does not exceed the necessary and legitimate effect of the facts from which it is inferred. 1 Mecham on Agency (2nd Ed.) § 708, p. 497. Such implied authority grows out of the implied acquiescence of the principal to the act of the agent. Id. at p. 498. Mecham also states that every delegation of authority carries with it implied authority to do all those acts which are naturally and ordinarily done in such cases and those acts which are reasonably necessary and proper to carry on the usual and ordinary business of the agent. Id. § 715, p. 502.

In addition, if the parties are found to have acted with reference to the customs of a particular trade or the habits of dealings of a particular party, such customary exercise of a particular act by the agent and acquiescence by the principal may show that the agent was clothed with actual authority to act. Id. § 717, p. 506. Fletcher further comments that implied authority is "the authority which the principal intended that the agent exercise and includes all those things which are directly connected with and essential to the business at hand." Fletcher, *supra*, § 438, p. 320. *See also* Fletcher, § 449, pp. 348–349 in which he says that:

A person who knows that the officer or agent of the corporation habitually transacts certain kinds of business for such corporation under circumstances which necessarily show knowledge on the part of those charged with the conduct of the corporate business assumes, as he has the right to assume, that such agent or officer is acting within the scope of his authority. The rule applied is that the authority of an agent to do certain acts in behalf of his principal may be inferred from the continuance of the acts themselves over such a period of time and the doing of them in such a manner that the principal would naturally have been cognizant of them and would have forbidden them if unauthorized.

Id. § 449, pp. 348–9.

These rules apply fully to the facts at hand. Certainly Wallace had authority to sign the routine audit statements in the ordinary course of his conduct as President of the company and to render the corporation responsible for the audit statements. These were, after all, routine accounting statements, and certainly where he signed them as a matter of course and mailed them to others over a period of at least two years they are to be considered or to be received in evidence. Unquestionably the Board of Directors was familiar with this routine procedure. They certainly were familiar with the fact that these accounting statements were made at regular intervals. If the President did not have any authority to sign routine communications with the creditors, the Board would have surely made it clear that he did not have the authority to do so at the time.

Diversified relies on the decision in *Salt Lake Valley Loan and Trust Co. v. St. Joseph Land Co.*, 73 Utah 256, 273 P. 507 (1928) as the controlling authority in this case. Its holding was that the president of a corporation lacks authority to revive debts barred by the statute of limitations absent an express grant of authority. The controlling facts in *Salt Lake* were that the president of the corporation acted on a single transaction in order to commit the corporation to a particular course of business. The president took a specific action with reference to that matter. The actions of the president in writing letters to the defendant acknowledging the debt were held not to be binding on the corporation. But in the instant case the president was acting routinely in the ordinary course of his business, and not for the purpose of binding the corporation to a contract at all. He was seeking to notify the debtor as to what the books showed and to receive some response from him. No particular special action was taken in regard to this debt. Wallace did have the authority to act in furtherance of the ordinary course of his business as President of Diversified. Hence *Salt Lake Valley* does not control the case which is here presented.

■ We are of the opinion moreover that there is no disputable issue of fact regarding Wallace's authority to sign the audit statements. The question with which we are concerned is whether the audit statements constituted acknowledgement by Wallace, and thereby by Diversified, of the debt to Buxton in order to fall within the statute which would toll the statute of limitations. This is an evidentiary question and not a substantive one or a factual one. We agree with the district court that the audit statements did constitute an acknowledgment very clearly.

Our decision in *Victory Investment Corp. v. Muskogee Electric Traction Co.*, 150 F.2d 889 (10th Cir.), *cert. denied*, 326 U.S. 774, 66 S.Ct. 232, 90 L.Ed. 467 (1945) considered whether, under an Oklahoma statute which extended the statute of limitations similar to the one involved in the case at bar, the financial statements of the defendant constituted acknowledgment of a debt sufficient to toll the statute of limitations. In that case the question was whether the form of the latest acknowledgment was clear enough. The court said:

It is not essential that the acknowledgment be expressly stated in such words as 'I acknowledge this as an existing debt,' or 'I am liable on these bonds.' It is enough if language is used from which the acknowledgment may be fairly inferred.

150 F.2d at 891.

The suit in the *Victory* case was on corporate bonds. The defendant had submitted statements to the trustee acting for the bondholders and these contained the general trial balance and the general balance sheet which reflected as a liability an item entitled "Matured Funded Debt Unpaid" and items entitled "Matured Interest Unpaid" and "Matured 2% Tax on Bonds". The court said that the bonds were referred to in one place as a liability and in another place as a current liability. The court held that the statements constituted:

the equivalent of the defendant submitting to the trustee a written statement signed by it saying 'These bonds are my current liability.' And we think [the statements] constituted a distinct, direct, and unequivocal acknowledgment of a present debt, within the meaning of the statute, and therefore [were] sufficient to interrupt the statute and start it running anew.

150 F.2d at 892.

■ It is clear from the cases that the acknowledgment need not express the intention of acknowledging by use of the term. It is legally sufficient if the purported acknowledgment is in such terms as to communicate this concept or thought to the person receiving it. The audit statements signed by President Wallace said:

"Our auditors are making an examination of our financial statements which indicate the following amount payable to you on notes: ... Please confirm the accuracy of the above information...."

We are unable to see how the statement could have been more plain. The trial court regarded the statement as being unequivocal in acknowledging a present debt. We agree with the finding. It is in accordance with the holding of this court in *Victory*.

## II.

### Is Diversified Estopped From Asserting the Statute of Limitations as a Defense to this Action?

■ We must hold that it is.

The Supreme Court of Utah has set forth the standards which are applicable to estoppel as the doctrine is now being considered. The Utah court said:

... The test is whether there is conduct by act or omission, by which one party knowingly leads another party, reasonably acting thereon, to take some course of action, which will result in his detriment or damage if the first party is permitted to repudiate or deny his conduct or representation.

*J. P. Koch, Inc. v. J. C. Penney Co., Inc.*, 534 P.2d 903, 905 (1975).

We have examined the standards which are set forth by the Utah court in *Koch* and are of the opinion that it is a correct statement, and that it applies fully to the case before us.

Diversified argues that there is no showing that it represented to Buxton that the statute of limitations would not be used or that Buxton relied on the letters in failing to bring a suit. But this is not the test. It was not necessary for Diversified to have represented in express terms that it would not invoke the statute of limitations. The question is did Diversified knowingly represent to Buxton that the corporation owed a debt to Buxton. Obviously it did. Moreover, it was entirely logical for Buxton to conclude from the repeated acknowledging of the debt that agreement existed between him and Diversified that the debt was owed and that interest was running. It would quiet any apprehension that he might have had as to whether the debt was alive and well. The continued acknowledgment by Diversified conveyed to him that there was no need for him to seek to enforce the debt.

Contrary to the contention of Diversified it was not necessary to the creation of an estoppel for the audit letters to set forth a promise to pay. Buxton testified that after receiving the letters for many years he believed that the company was aware of the debt, and intended to pay it when possible, i. e. when it was financially able to pay it. Since there was no dispute between the company and him, he felt it was unnecessary to bring a suit in order to establish that which the company admitted. Now the company takes the position that Buxton allowed the statute of limitations to run. He is justified in responding that he was lulled into a state of inaction. It is entirely logical to hold that Diversified is not to be allowed to now dispute either the existence or validity of the debt.

We have heretofore followed the principle that "estoppel arises where one by his conduct, lulls another into false security and into a position he would not take only because of such conduct." *McWaters and Bartlett v. United States*, 272 F.2d 291 (10th Cir. 1959) as applied to this case: By representing to Buxton that Diversified recognized that $20,000 debt owed to Buxton, Diversified lulled Buxton into a false sense of security. This was wholly inconsistent with the proposition that Diversified disputed the debt. Hence, Buxton saw no need to sue. It follows that the requisites of estoppel were present in this case.

The decision of the Fifth Circuit in the case of *Ingalls v. Ingalls Iron Works Co.*, 258 F.2d 750 (5th Cir. 1958) is cited and relied on by Diversified as applicable to this case. The dispute in the *Ingalls* case concerned whether the account was an open account, or a stated account which was balanced and rendered with an assent. The account was the result of a number of transactions over a period of twenty years. The court held that a reply to an audit statement could not be considered as sufficient to change an open account to an account stated. It is the language in *Ingalls* which is relied on by Diversified. We

can only say that the language used was to the effect that it would be unjust to construe a reply to a single audit inquiry as a commitment to an account stated. The problem must be considered in its factual setting, and ours is wholly different from that which was present in *Ingalls*. It would be improper in our case to not hold under the facts presented that the several letters did constitute an acknowledgment. The opinion of Judge Rives in *Ingalls* took into account the peculiar facts of that case in reaching the conclusion which the court reached. We must, thus, reject the argument of Diversified that it cannot be subject to estoppel particularly on the ground that it would impede accounting practices.

## III.

*Is There Evidence on the Issue of Repayment of the $20,000 Debt Which Would Justify Submission of This Issue to a Trier of Fact?*

We are unable to find any substantial evidence in the record which would support a conclusion that the debt had been paid. It is true that Buxton received stock from U.S. Silver and Mining Co. in 1970. Buxton testified that the transfer of the stock to him occurred in connection with a distinct transaction. This was a ranching transaction between him and Bob Pinder. There was no evidence offered to show that this stock transfer had to do with the debt in question, and hence there would not be any justification for allowing the jury to speculate on this. An opinion was given by William Wallace, President of Diversified. It stated:

> *It is my opinion* that certificate No. 11963 of U.S. Silver and Mining Corp. represents payment in full for any alleged loan made to U.S Silver and Mining Corp. by John Buxton. (Emphasis added).

An opinion is quite different from a fact. The trial court recognized this in its statement that if Mr. Wallace had "any conviction about (the stock being given as repayment for the debt) he'd state what the fact was. He didn't. He says 'it's my opinion' ". The court found that the statement was not sufficient to create an issue of fact. We agree.

## IV.

*Was the Case an Appropriate One for the Grant of a Summary Judgment?*

We hold that it was.

Rule 56(c) allows summary judgment where, as here, there is no genuine issue as to any material fact and (the law) entitles the moving party to judgment.

The case presented is one in which the moving party was entitled to judgment as a matter of law. The trial court ruled correctly.

The judgment is affirmed.