THIEL INDUSTRIES, INC., a North Dakota Corporation, Plaintiff and Appellee,

v.

The WESTERN FIRE INSURANCE COMPANY, Defendant and Appellant.

Civ. No. 9666.

Supreme Court of North Dakota.

March 4, 1980.

Rehearing Denied March 21, 1980.

Kelsch, Kelsch & Tudor, Mandan, for plaintiff and appellee; argued by William C. Kelsch.

Pearce, Anderson, Thames & Durick, Bismarck, for defendant and appellant; argued by B. Timothy Durick, Bismarck.

PEDERSON, Justice.

This is an appeal from a judgment entered after a trial to the court without a jury. The judgment requires Western Fire Insurance Company to pay Thiel Industries, Inc., for the costs to replace a damaged underground electrical distribution system under the terms of an All Risk Construction and Installation Floater policy. The judgment is reversed.

Western's appeal challenges none of the findings of fact which were prepared as required by Rule 52(a), N.D.R.Civ.P., but argues that, as a matter of law, the trial court misconstrued the terms of the policy in concluding that the property was covered by insurance at the time it was damaged. We agree.

### The Construction Contract

In December 1971, Thiel contracted to install, by April 1972, an underground electrical distribution system to service 33 buildings in a housing development at Cavalier. The contract recited a lump sum consideration of $13,861.00, but authorized partial payments "for lineal feet, for quantity in place." The contract documents in the record do not show unit prices; however Thiel testified that the installation was completed before the contract completion date; that he submitted a bill showing unit bid prices; and that he was paid in full $15,077.97. He further testified that, without any additional contract or amendment, Thiel did "other work" that "snowballed" to approximately $100,000, approximately $20,000 has not been paid, and the matter is tied up in bankruptcy proceedings.

The contract, which was on a preprinted form, among other things provided that: "No payment on account shall operate as an approval and acceptance for the work done or materials furnished, or any part thereof." Another attached typewritten provision specified that the owner had the right to take possession of and use the completed portions of the work *before the time for completion* but that "such taking possession and use shall not be deemed an acceptance of the *work not completed in accordance with the Contract Documents.*" [Emphasis added.]

Also, as an attached, additional typewritten term is the requirement that Thiel "shall warrant all equipment furnished and work performed by him for a period of one year from the date of written acceptance of the work."

### The Insurance Contract

A pertinent provision of the preprinted policy provides that coverage of property shall continue "until formally accepted by the owner . . . ." Provision is also made for a computation of the monthly premium due, based upon reports showing, as of the last day of each month, "the total completed value of all construction contracts insured . . . ." On a typewritten endorsement attached to the policy is the following amendment:

"Property Covered. This policy insures:

(A) materials, supplies, machinery, equipment, fixtures, and temporary structures to be used in or incidental to the construction, fabrication, installation, erection, or completion of electric transmission lines and sub-stations, including poles, towers, conductors and equipment to be located in sub-stations, *in the care, custody and control of Insured . . . .*" [Emphasis added.]

### The Unchallenged Facts Found by the Trial Court

Because Western has not challenged the findings of fact made by the trial court, and neither Western nor Thiel has argued that there should have been additional or different findings made, we will apply the law to the following critical facts that were found:

(1) Thiel completed construction and installation of the underground electrical distribution system in March 1972.

(2) The owner took possession of the system and began using it in November 1972.

(3) The system was destroyed because of misuse by the owner in February 1973.

(4) The work was never "formally accepted." [1]

### Issue

We view the critical legal issue to be whether or not the insurance contract was ambiguous as to the property covered and, if so, whether the terms of the insurance contract should be construed against Western, the insurer.

The question as to the existence or nonexistence of an ambiguity in a contract is a question of law and, "When good arguments can be made for either of two contrary positions as to the meaning of a term in a document, an ambiguity exists." *In Re Estate of Johnson*, 214 N.W.2d 112 (N.D. 1973), Syllabus 2.

From remarks in the record at the conclusion of the trial, it is apparent that the trial court concluded that the insurance contract was ambiguous because it provided, at one place, that the property is covered by insurance until the owner formally accepts the work and, at another place, that the property is covered only while it is in the care, custody and control of the insured.

Our examination of the insurance contract discloses that the typewritten, added provision which states that the property is covered only while it is in the care, custody and control of the insured is clearly identified as an "amendment" of the preprinted insurance contract. The conflict between the words in a contract provision and the words in an amendment to that contract provision cannot supply the basis for a conclusion that the contract is ambiguous. Even in cases where one of the provisions is not labeled an "amendment," the general rule requires that typewritten additions to preprinted documents shall control. See § 9–07–16, NDCC, and our recent decision in *Olson v. Peterson*, 288 N.W.2d 294 (N.D. 1980).

Another general rule that prevents us from agreeing that Thiel was in "constructive custody" of the system in February 1973 when it was destroyed is discussed in 63 Am.Jur.2d Property, § 39, which states, in part:

"One may have possession of a chattel, even in the absence of actual personal custody, if the chattel is under his control and in a place where it must have been put by his act or in his behalf, or where the chattel is within his power in such a sense that he can and does command its use."

There is no evidence to show that Thiel had any command over the use of the electrical distribution system after its completion in March 1972.

This leads us to a further examination of the terms of the construction contract itself. Certainly, the terms thereof require an acceptance by the owner as quoted hereinabove. Thiel has argued that neither payment for the system nor taking possession and use by the owner shall be deemed acceptance. We agree with his interpretation that payment under the contract shall not operate as acceptance, but payment was not made in this case pursuant to the contract. The contract required partial progress payments and payment of the balance only after approval of the work. This is a standard method of payment on construction contracts. Payment was made—

---

1. The trial court concluded that, as a matter of law, because of the lack of "formal acceptance," the property was in the "Constructive Custody" of Thiel when it was destroyed in February 1973.

in this instance, lump sum after all work had been completed and without any apparent determination that the work was acceptable.

Secondly, we think Thiel misreads the contract when he argues that possession and use shall not operate as acceptance. First of all, the clause applies, by its own terms, only to possession and use of completed portions before the time for completion. Here, the possession and use by the owner of the system was after the entire system had been completed. In addition, also by its very terms, possession and use shall not be deemed an acceptance of the work that does not comply with the contract specifications. The only evidence on that matter indicates that the work was all done in accordance with the specifications.

Finally, no claim was made against Thiel that the damaged property would have to be replaced at his cost—only that "the issues remain unsolved." To the contrary, the system was redesigned as an overhead electrical distribution system at no expense to Thiel and he was invited to bid, and did bid, on the construction and installation of the overhead system. All of these factors support a conclusion that, as a matter of law, there was constructive acceptance of Thiel's work and he had no obligation whatsoever to repair or reconstruct the damaged, underground electrical distribution system. The one-year guaranty of the equipment and work performed does not enter into the question before us nor does the formula for the computation of premiums payable by Thiel to Western.

The judgment is reversed.

ERICKSTAD, C. J., and VANDE WALLE and SAND, JJ., concur.

PAULSON, Justice (dissents).

The majority opinion has briefly stated its reasons in support of a reversal of the judgment of the district court of Morton County.

Thiel entered into a contract to install an underground electrical system with Triangle Construction Company, a subsidiary of Endeco. Endeco was in the process of constructing a housing complex and had entered into a long-term lease with Western Electric. Thiel at all times since the year 1949 had been insured with Western Fire Insurance Company to pay Thiel under the terms of an all risk construction and installation floater policy.

Thiel, pursuant to the contract with Endeco, constructed a primary distribution system which was designed by another company. This particular portion of the contract totaled approximately $14,000. Thiel, at the request of Endeco, performed additional work which, under the continuing contract, totaled nearly $100,000.

The primary electrical cables which led from the power lines to the transformers were installed and completed approximately five months after entering into the contract. In February of 1973 there was a major failure in the electric system because of an overloading of the secondary cable system which ran from the transformers to the various apartment complex units. The failure occurred because of an overload which was not the fault of Thiel, according to the engineer's report.

Thiel, as mentioned, completed all of the electrical work because of the additions and changes which were requested by Endeco from time to time.

In 1973, at the time of the failure of the underground electrical system, Endeco still owed Thiel a balance of slightly in excess of $30,000. Endeco then forwarded Thiel a letter dated May 23, 1973, enclosing a check for $10,000, which letter stated, in pertinent part:

"Enclosed is our check in the amount of $10,000.00 to be applied to our account.

"This payment is not to be considered as recognition of exoneration in the matter of the power system failure at the Cavalier project, as the issues remain unresolved."

The contract which was entered into between Thiel and Western Fire Insurance Company provided, in pertinent part:

"No payment on account shall operate as an approval and acceptance for the work done or material furnished or any part thereof." (Contract § 4, A–12)

"Upon complete performance of this subcontract by the subcontractor, and *approval, acceptance* and payment for the subcontractor's materials and work by the owner, the Contractor shall make final payment to the subcontractor of the balance due the subcontractor   .   .   ." (Contract § 4, A–12)

"The subcontractor shall warrant all equipment furnished and work performed by him for a period of one year from the date of *written acceptance* of the work." (Contract § 13, A–13)

The majority opinion concedes that Western did not challenge any of the findings of fact of the trial judge.

One of the determinative issues in this case is whether or not there was ever a formal acceptance by Endeco. Whether or not there was acceptance is a question of fact. Rule 52(a), N.D.R.Civ.P. The letter dated May 23, 1973, and forwarded by Endeco to Thiel is most revealing in that it states that "This payment is not to be considered as recognition of exoneration in the matter of the power system failure at the Cavalier project, as the issues remain unresolved." However, following the failure of the underground electrical system, Thiel submitted a bid for the corrective work specified by the engineers and which bid was in the sum of $19,950. The district court found this sum to be a reasonable one. Thereafter Endeco filed for bankruptcy and Thiel filed a claim with Western Fire Insurance Company. I refer to Endeco's letter of May 23, 1973, *supra*, which supports the finding of fact that there was never any formal acceptance of the contract by Endeco.

The majority opinion concludes that there was a constructive acceptance of Thiel's work and that, therefore, Thiel was not in "constructive custody" of the system. I agree with the statement in the majority opinion that typewritten additions control over preprinted portions of an insurance contract. I cannot agree with the holding that command over the use of the electrical distribution system should determine when it is in the custody of a party. It is an every day occurrence in the construction field, especially in the building trades, to find people occupying the building before formal acceptance of the job. The majority opinion concludes that payment was made in a lump sum without any apparent determination that the work was acceptable. However, the majority opinion then proceeds to list several factors upon which it bases its conclusion that there was constructive acceptance. This strikes me as a strained interpretation of the policy.

The policy is an "All Risk Construction and Installation Floater" policy, designed to cover the contractor until such time as he no longer has an insurable interest[1] in the work. Thiel still maintained a right to payment of part of its account from Endeco. Therefore, Thiel would still have a right to a mechanic's lien on the property of Endeco to secure its contract balance due. The trial court concluded that Thiel still maintained an insurable interest in materials and labor which comprised the electrical distribution system. I agree. Until such time as the work was formally accepted by Endeco pursuant to the contract or until such time as it was no longer in the "constructive custody" of Thiel, as I interpret that term, the policy remains in force.

The term "constructive custody", as I interpret it, means that the property is in the custody of the insured until such time as he relinquishes every right or interest which he has in the property. Given the nature of the construction industry, the fact that pos-

1. For a discussion of the term "insurable interest" as it has been defined in North Dakota, see *Reishus v. Implement Mutual Dealers Insurance Company*, 118 N.W.2d 673, 682 (N.D. 1962). See § 26–02–06, N.D.C.C. In the instant case, the interest which Thiel had is even greater than the interest involved in *Reishus, supra*, because Thiel arguably has a mechanic's lien; and in *Reishus* the holding was that even perfection of a mechanic's lien was not required in order to have an "insurable interest".

session was in Endeco or that payment had been made is not enough. There must also be shown a formal acceptance by Endeco or a formal relinquishment of the interests and rights of Thiel. Trade practices of the building industry and the uncontested findings of the district court indicate that there was no acceptance of Thiel's work, constructive or otherwise.

Accordingly, I would affirm the judgment of the district court.