David M. PEAR, Plaintiff, Appellant and Cross–Appellee,

v.

GRAND FORKS MOTEL ASSOCIATES, a North Dakota limited partnership, Defendant, Appellee and Cross–Appellant.

Civ. No. 960048.

Supreme Court of North Dakota.

Oct. 1, 1996.

Rehearing Denied Oct. 22, 1996.

---

**776**

Fisher, Olson, Daley & Bata, Ltd., Grand Forks, for plaintiff, appellant, and cross-appellee; argued by Michael F. Daley.

Pearson, Christensen, Larivee, Clapp, Fiedler & Fischer, Grand Forks, for defendant, appellee, and cross-appellant; argued by Jay H. Fiedler.

MESCHKE, Justice.

David M. Pear, a limited partner in Grand Forks Motel Associates, appealed a summary judgment that the statute of limitations barred collection of his $100,000 demand note from Associates. Associates cross-appealed a ruling that the demand note was not a capital contribution to the partnership. We affirm in part, reverse in part, and remand.

David's father, Charles Pear, and Stanford Hoye formed Associates as a limited partnership in 1983 to buy and operate a motel in Grand Forks. For initial capital of $153,000, Seymour Svirsky contributed $1,000 as a general partner; Hoye invested $1,000 as a general partner and $75,000 as a limited partner; Charles Pear $1,000 as a general partner and $45,000 as a limited partner; and David Pear $30,000 as a limited partner. In 1984, Hoye contributed $110,000 more capital; Charles Pear, $66,000 more; and David Pear, $44,000 more. Since then, bookkeeping losses have continuously decreased each partner's capital account to an enlarging negative figure.[1]

During 1984 as well, the partners made demand loans to the partnership: $250,000 by Hoye; $150,000 by Charles Pear; and $100,000 by David Pear. David's demand note for $100,000, with interest at "prime +3%," was issued on October 5, 1984, and signed by both Hoye and Charles Pear, each as a "Gen. Partner."

Charles Pear died in 1985. In 1986, his estate sold his partnership share and his demand note to Hoye. Since then, Associates's annual financial reports have continuously shown, separately from the negative capital accounts, notes payable to partners of $400,000 to Hoye and $100,000 to David Pear.

In the early years, the partnership paid the interest on the notes but, after 1986, the partnership "expensed" the interest on the notes without paying it. Instead, the certified public accountants (CPAs), who annually

---

1. Passing losses directly to limited partners for tax purposes this way has increased the use of a limited partnership in recent times because it is not usually treated as a separate taxable entity for federal income taxes. *See* 59A Am.Jur.2d *Partnership* § 1240 (1987). For that reason, a limited partnership is often used to invest in real estate, *id.,* like Associates was used to invest in this motel.

audited the partnership business, informed David Pear each year that "accrued [interest] expenses of the partnership must be included as interest income for you," and also notified him of the exact interest amount to report. Since 1986, Associates has continuously accrued "[n]on-current interest payable," which came to $448,819 by 1993.

In 1993, Associates began a $900,000 project to refurbish and renovate the motel. When the other partners declined to help finance the project, Hoye personally advanced funds, guaranteed loans, and pledged personal collateral to finance it.

After that, Hoye, as managing general partner, still refused to pay out interest on the demand notes, and also decided to save some interest expense by delivering a renewal demand note to David Pear with interest reduced to "Prime." David Pear resisted the lower interest rate and, on December 3, 1993, he made a written demand on Hoye, as managing partner, for payment of the entire principal and interest accrued on his note, totaling $189,763.51.

When Associates did not pay the debt, David Pear sued Associates for it on February 16, 1994. Associates answered that the note "documents a capital contribution by [David Pear] which is reimbursable to him pursuant to the provisions of the Certificate of Limited Partnership," and alternately defended that, if the note was really debt, David Pear's claim was "barred by the applicable statute of limitations." Both sides moved for summary judgment.

The trial court recognized that the partnership agreement authorized interest on capital, the agreement restrained "withdrawal or the return of his capital contributions or any part thereof, except in accordance with this Agreement," and it contained nothing to prevent a partner from loaning money to the partnership. The court concluded both the partnership agreement and the demand note were "clear, certain, and unambiguous," applied the parol evidence rule to exclude proof of an oral agreement inconsistent with those written contracts, and decided the demand note was not capital controlled by the withdrawal restraints, but was debt barred by the contractual statute of limitations. The court decided that the statements of Pear's note as a partnership obligation, in the CPA's annual letters to him to report accrued interest for income taxes, were not sufficient written acknowledgments of the debt to deflect the statute of limitations because those letters were not signed by a general partner. The court ordered summary judgment dismissing Pear's suit to collect the note.

David Pear moved to reconsider and amend the judgment. His additional affidavit submitted copies of Associates's 1992 income tax return signed by Hoye; of minutes of a 1992 partnership meeting that reconfirmed Hoye as managing general partner and accepted the audit report for 1991; of the 1993–1994 audit report (showing Hoye had transferred his demand notes to Eileen K. Hoye); of a 1993 letter from the General Manager of Stan Hoye Associates to Pear, that enclosed the renewal note with reduced interest to replace the 1984 note; and of the renewal note.

The trial court adhered to its decision that the audit reports and letters, not signed by a general partner, were insufficient written acknowledgments of the debt. The court rejected the 1992 income tax return of the partnership, even though signed by Hoye, because "the mere listing of a debt on a partnership tax return [does not] constitute[ ][the] distinct, unqualified, and unconditional recognition of the debt" required under NDCC 28–01–36 by Huus v. Huus, 75 N.D. 392, 28 N.W.2d 385, 392 (1947). Finally, the court held David Pear could not use equitable estoppel to avoid the statute of limitations because "then [Associates] should also be given the same opportunity" to use equitable estoppel to avoid David Pear's claim on the debt that Associates asserted to be capital. The court denied reconsideration.

David Pear appeals, arguing the audit reports, letters with enclosures, and tax returns showed genuine issues of material fact about written acknowledgments of the debt to avoid the statute of limitations. He also argues there are material issues of fact on whether Associates should be equitably estopped from using the statute of limitations. In its cross-appeal, Associates argues the

trial court "should have considered evidence of the circumstances under which the [note] instrument was drawn, executed and delivered in order to determine its true nature" as capital, not debt. Each side seeks a different summary judgment or a trial.

■ Summary judgment is a procedure to promptly dispose of a lawsuit without a trial if, after viewing the evidence and possible inferences most favorably to the party against whom judgment is sought, there is no genuine dispute about either the material facts or the inferences from undisputed facts, or if there is only a question of law. *Diegel v. City of West Fargo*, 546 N.W.2d 367 (N.D. 1996); NDRCivP 56. A party resisting a summary judgment must present evidence, by affidavit or some other admissible and competent form, that shows a genuine issue of material fact. *Borsheim v. O & J Properties*, 481 N.W.2d 590 (N.D.1992). A summary judgment is proper when a party fails to raise a reasonable inference of an element essential to the claim that party must prove at trial.

*1. Capital or Debt?*

In its cross-appeal, Associates argues the "purported 'Promissory Note' was never intended to be a promissory note; rather it was intended to document the partners' capital contributions." Associates asserts the trial court "should have considered evidence of the circumstances under which the [note] instrument was drawn, executed, and delivered in order to determine its true nature" as capital.

Associates relies upon similar affidavits by general partner Hoye and by J. Hugh Shelnutt, Associates's principal CPA. Both asserted the "factual circumstances surrounding the execution of the purported Promissory Note ... are complex and involved technical interpretations of the Internal Revenue Code," but neither identified relevant tax statutes, regulations, or rulings. To finance the motel, Hoye said Associates was required by the lending bank to make "a minimum $1,160,000.00 in improvements" to the motel with only $375,000 of that to come from mortgage proceeds and "the remainder from the partners. This consisted of $353,000.00 capital and a capital contribution of $500,000.00." Hoye said he contributed $250,000 and Charles Pear did too, but $100,000.00 of Charles's "capital contribution" was "allocated" to David Pear. Hoye swore that he was "personally aware that the $250,000.00 contributed by Charles Pear was money ... borrowed from a financial institution and upon which [Charles] was required to pay interest. It was Mr. Pear's required interest payments that led to the partner's capital contributions being documented in the purported Promissory Notes."

Shelnutt asserted, because "the federal tax law allows a person to deduct 'investment interest expense' ... only if there is corresponding investment income," Charles Pear "could not contribute borrowed money to the Limited Partnership as a capital contribution and deduct the interest which he was paying on that money. In order to deduct the interest expense, he had to receive investment income." Since Charles Pear "was primarily responsible for business decisions and operation of the hotel in 1983 and until his death in 1986," Shelnutt said Charles Pear "decided that Promissory Notes would be issued for the capital contributions" so that "he would generate 'investment income' by receiving interest on the purported Promissory Note" and, "in turn, created a partnership interest expense."

Before issuing the demand notes, according to Shelnutt,

Charles Pear explained the rationale for his decision to issue the purported notes and assured all concerned that he would never make a demand for payment on the notes. The reason he gave those assurances is that everyone involved knew that the monies referenced in the purported Promissory Notes were actually capital contributions and that the lender required to make the improvements to the building owned by the Limited Partnership, and that the Limited Partnership would not be in a position to answer any demand for payment of the principal.

Subsequently, Charles Pear prepared and issued the Notes ... [while he] was re-

sponsible for the operation of the business at the time.

Hoye added that "[t]he Limited Partnership was not the[n], nor now, able to pay the princip[al] amount on demand. Upon Charles Pear's specific assurances that demand for payment would not be made on the Promissory Notes, they were issued."

"The Limited Partnership has made very large financial commitments in reliance upon" these assurances, including over four million dollars in debt, Hoye claimed. Hoye asserted payment of the notes "would cause very serious and, perhaps, irreparable, financial consequences to the business." Hoye added: "In reliance upon Mr. [Charles] Pear's representations, I have committed substantial personal assets as collateral for partnership debt" that, "[h]ad I understood that a demand [for payment] would be made on the purported 'Promissory Notes' I would not have made those commitments."

Shelnutt asserted a "Reissued Audit Report—December 31, 1986 and 1985" for Associates demonstrated the demand notes "were merely intended to document the partners' capital contributions" because they "were not treated as demand Promissory Notes; rather, they were treated as capital contributions." The audit's schedule of "Notes & Mortgages Payable" showed this, he said, because the list of

> Notes to the partners indicate[d] that the "Current Portion Payable" is "–0–." This clearly illustrates that the Notes were not considered demand Promissory Notes. If the "Notes" had been considered demand notes, the "Current Portion" referenced in the "Schedule of Notes & Mortgages Payable" would have been the full amount of the notes.

The trial court concluded these affidavits should not be considered because they portrayed an oral agreement inconsistent with the written content of the partnership agreement and the demand note. In his appeal, David Pear likewise relies on the parol evidence rule.

■ The parol evidence rule declares a written contract supersedes accompanying oral negotiations.

The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

NDCC 9–06–07. We agree with the trial court that the written agreements, the demand notes and partnership agreement, are so clear and unambiguous on the subjects of capital and debt that they preclude evidence about related oral negotiations inconsistent with the written documents.

■ The construction of a written contract to determine its legal effect is generally a question of law. *Pamida, Inc. v. Meide*, 526 N.W.2d 487, 490 (N.D.1995). A court must interpret the contract "to give effect to the mutual intention of the parties as it existed at the time of contracting." NDCC 9–07–03; *see Pamida*, 526 N.W.2d at 490. In a written contract, "the intention of the parties is to be ascertained from the writing alone if possible." NDCC 9–07–04; *see Pamida*, 526 N.W.2d at 490; *Matter of Diocese of Bismarck Trust*, 500 N.W.2d 203, 205 (N.D. 1993). A "written agreement super[s]edes any prior oral agreements or negotiations between the parties in the absence of any ambiguities." *Norwest Bank v. Christianson*, 494 N.W.2d 165, 168 (N.D.1992); *see also* NDCC 9–06–07; *Graber v. Engstrom*, 384 N.W.2d 307, 309 (N.D.1986) ("Oral negotiations or agreements which preceded or accompanied the execution of a written contract may be employed to explain its uncertain expressions but not to contradict or nullify its express terms.").

■ Only if the written contract is ambiguous, or if it "does not reflect the parties' intent because of fraud, mistake, or accident," can a court employ parol evidence to clarify the terms of the contract, or to find the intent of the parties. *Diocese of Bismarck Trust*, 500 N.W.2d at 205; *see Pamida*, 526 N.W.2d at 490; *Christianson*, 494 N.W.2d at 168; *Jorgensen v. Crow*, 466 N.W.2d 120, 123 (N.D.1991); *First Nat'l Bank & Trust Co. of Williston v. Scherr*, 435 N.W.2d 704, 706 (N.D.1989). But, if the written contract is clear and unambiguous, as

here, the reviewing court should go no further. *Pamida,* 526 N.W.2d at 490. As we explained in *Jorgensen,* 466 N.W.2d at 123, a trial court's decision to admit or exclude parol evidence to interpret a contract is one of law that is fully reviewable on appeal.

■ A limited partner may lend money to the partnership unless otherwise agreed in the partnership agreement, and has the same rights in the loan as a person who is not a partner. NDCC 45–10.1–07. The Associates's agreement does not prohibit a loan by a limited partner, nor does it classify a partner's loan as a capital contribution.[2]

Indeed, a limited partner's promise to contribute capital to the partnership is not enforceable unless it is in a writing signed by the limited partner. NDCC 45–10.1–31(1). Associates does not argue that David Pear agreed in writing to contribute his $100,000 loan to the partnership's capital.

■ Rather, Associates argues David Pear "should be estopped from asserting his claim based upon the twin doctrines of estoppel and laches" because the note was "executed and delivered upon specific representations that it would not be enforced as such and, indeed, that no demand for payment ... would be made"—representations by David's father "who was, as a matter of fact, [David's] privy." Associates urges that David Pear "himself did not seek to enforce the alleged 'Note' for almost ten years after it was delivered," while Associates "relied upon the representations ... when it made very significant business decisions which cannot now be undone."

■ We conclude that Associates's affidavits do not show the kind of fraudulent representations that would require a trial of issues of fact on estoppel. *See Lohse v. Atlantic Richfield Co.,* 389 N.W.2d 352 (N.D. 1986) (affirming summary judgment that estoppel inapplicable when facts and circumstances did not establish sufficient promise or agreement); *Cooke v. Blood Systems, Inc.,* 320 N.W.2d 124 (N.D.1982) (holding estoppel inapplicable when facts did not establish sufficient promise); *see also Matter of Helling,* 510 N.W.2d 595, 596 n. 1 (N.D.1994) ("equitable estoppel applies to representations of present and past facts while promissory estoppel applies to representations of future events"). Only when a written contract was prevented by fraud can an oral contract be enforceable.

> When a contract which is required by law to be in writing is prevented from being put into writing by the fraud of a party thereto, any other party who by such fraud is led to believe that it is in writing and acts upon such belief to his prejudice may enforce it against the fraudulent party.

NDCC 9–06–03. Associates has not claimed that fraud by either Charles Pear or David Pear led anyone to believe the partnership agreement, or a written amendment to it, classified David Pear's demand loan as capital.

We affirm the summary judgment that the $100,000 demand note to David Pear was not partnership capital, but rather was a partnership debt.

## 2. *Statute of Limitations?*

David Pear argues the trial court "improperly determined that none of the communications from the partnership" to him was a written acknowledgment of the debt that would, in the phrasing of NDCC 28–01–36, "take the case out of the operation of th[e] chapter" on statutes of limitations. Pear urges

> [t]he letters, audit reports, tax returns, partnership minutes and replacement note of 10/31/93 sent to David ... are clear in respect to the note, its terms and the obligation of the partnership to David

---

2. In a limited partnership, a general partner has obligations, powers, and rights like those of a partner in a regular partnership, *see* NDCC 45–10.1–27 and 45–06–07(1)(b), but a limited partner's rights and obligations are much different than a general partner's. *See* 59A Am.Jur.2d *Partnership* §§ 1231, 1280. A limited partner has no right to participate in the management of the business and has no liability beyond capital contributed. *Id.;* NDCC 45–10.1–22. In sum, in a limited partnership, general partners, with unlimited liability, manage the business; limited partners contribute only investment capital without participating in the business and without liability beyond capital contributed.

Pear.... Associates should not be allowed to reap tax and other benefits from the note, while at the same time trying to avoid its obligations.

Associates responds that "none of the documents are an acknowledgment of indebtedness as contemplated by N.D.C.C. § 28–01–36," but Associates entirely evades addressing the effect of the replacement note. While each of the letters, audit reports, and tax returns may not be a completely unequivocal acknowledgment in itself, together they raise material issues of fact. More importantly, we conclude the replacement note, as a matter of law, unequivocally acknowledges renewal of the debt and takes this case out of the statute of limitations.

For a long time, a claim on a demand note accrued "upon its date." NDCC 41–03–22(1)(b) (UCC 3–122) (enacted by 1965 N.D.Laws ch. 296, § 1, but since repealed, effective July 1, 1993, by 1991 N.D.Laws ch. 448, § 22). The 1965 enactment carried forward earlier case law in North Dakota. In *Baird v. Utecht*, 67 N.D. 491, 274 N.W. 513, 514 (1937), this court ruled:

An action on a promissory note must be commenced within six years after the cause of action thereon shall have accrued. Section 7375, Compiled Laws of North Dakota for 1913. The causes of action on the [demand] notes involved in this case accrued on ... the date of their delivery, and no action could be commenced thereon after six years from that date unless the running of the statute was tolled.

The current edition of the statute of limitations enforced in *Baird*, NDCC 28–01–16(1), directs that a claimant must begin an "action upon a contract, obligation, or liability" within "six years after the claim for relief has accrued." We restated this general rule in *Matter of Helling*, 510 N.W.2d 595, 596 (N.D. 1994) (citing NDCC 28–01–16(1) and *Baird*): "A creditor must commence an action upon a demand note within six years from the date of the note."[3]

Pear's demand note was dated October 5, 1984. Therefore, Pear's debt claim became barred on October 5, 1990, unless the limiting time is otherwise extended or avoided.[4]

---

**3.** Effective July 1, 1993, the Legislature changed when the claim accrued and also enacted a special statute of limitations for a demand note:

Except as provided in subsection 4 or 5, if demand for payment is made to the maker of a note payable on demand, an action to enforce the obligation of a party to pay the note must be commenced within six years after the demand. If no demand for payment is made to the maker, an action to enforce the note is barred if neither principal nor interest on the note has been paid for a continuous period of ten years.

NDCC 41–03–18(2) (UCC 3–118); *see* 1991 N.D.Laws ch. 448, §§ 10, 24. The Official Code Comment to this revised UCC section explains why the changes were made:

Although a note payable on demand could theoretically be called a day after it was issued, the normal expectation of the parties is that the note will remain outstanding until there is some reason to call it. If the law provides that the limitations period does not start until demand is made, the cause of action to enforce it may never be barred. On the other hand, if the limitations period starts when demand for payment may be made, i.e. at any time after the note was issued, the payee of a note on which interest or portions of principal are being paid could lose the right to enforce the note even though it was treated as a continuing obligation by the parties.... Subsection [2] is designed to bar notes that no longer represent

a claim to payment and to require reasonably prompt action to enforce notes on which there is default. If a demand for payment is made to the maker, a six-year limitations period starts to run when demand is made. The second sentence of subsection [2] bars an action to enforce a demand note if no demand has been made on the note and no payment of interest or principal has been made for a continuous period of 10 years. This covers the case of a note that does not bear interest or a case in which interest due on the note has not been paid. This kind of case is likely to be a family transaction in which a failure to demand payment may indicate that the holder did not intend to enforce the obligation but neglected to destroy the note. A limitations period that bars stale claims in this kind of case is appropriate if the period is relatively long.

U.C.C. § 3–118 cmt. 2, 2 U.L.A. 46 (1990).

**4.** If the new statute described in footnote 3 applied here, Pear's claim would not have been barred because he sued within six years of his demand for payment. While most courts hold a new or amended statute-of-limitations time generally cannot be used to revive a barred claim, *see* NDCC 1–02–10, there are some contrary holdings. *See generally* 51 Am.Jur.2d *Limitation of Actions* §§ 44–46 (1970 & Supp.1996). Pear, however, has not urged the new statute could or should be applied in his case.

■ Still, even a barred debt is enforceable if the debtor sufficiently acknowledges the continuing debt to begin the limitation period anew, but the acknowledgment must be either a payment or in writing:

**New promise must be in writing in order to extend limitation—Effect of any payment.** No acknowledgment or promise is sufficient evidence of a new or continuing contract, whereby to take the case out of the operation of this chapter, unless the same is contained in some writing signed by the party to be charged thereby, but this section does not alter the effect of any payment of principal or interest.

NDCC 28–01–36. To begin the statute of limitations anew, the necessary written acknowledgment to renew the debt must be signed by the debtor.

■ "An acknowledgment or promise need not be in any specific form." *Huus v. Huus,* 75 N.D. 392, 28 N.W.2d 385, 389 (1947). Yet, a sufficient acknowledgment "is not merely an historical statement that at one time money was due and that it never was paid. It means an acknowledgment that there is a debt in existence which is to be paid." *Id.* at 391, 28 N.W.2d 385. In *Huus* at 392, this court recognized the debtor had acknowledged the existence of the debt in a letter to his creditor, but the court held the letter an insufficient renewal:

Where the plaintiff relies upon a promise inferred from a written acknowledgment of the debt this promise must be such as is deducible from the acknowledgment so that it can be said the acknowledgment clearly and fairly implies that the debtor promises to pay; but if the acknowledgment be such that the debtor merely intimates he will pay the debt if certain conditions which he mentions are fulfilled and retains to himself the power to determine whether he will pay under such circumstances it cannot be said that promise is so sufficiently explicit and unconditional as permits the removal of the bar of the statute.

*Huus,* Syllabus 3, 28 N.W.2d at 386. A written acknowledgment must "clearly and fairly" recognize the continuing debt.

■ Although the trial court rejected the letters, audit reports, and income tax returns from the CPAs as evidence of the continuing debt, precedents generally hold that filing of an income tax return that reports a debt is a sufficient written acknowledgment. *Diamond v. T. Rowe Price Assoc., Inc.,* 852 F.Supp. 372, 414–15 (D.Md.1994):

Diamond's reporting of imputed income on her tax returns is an acknowledgment sufficient to toll the statute of limitations. A tax return is a clear, distinct, and unqualified admission made in writing to the United States Government under penalty of perjury. Each time Diamond filed her income tax returns, the ... statute of limitations was automatically tolled for another year.

*See Sebastian Enter., Inc. v. Florida First Nat'l Bank,* 345 So.2d 827, 828 (Fla.Dist.Ct. App.1977) (accountant for corporation signed corporate tax returns and balance sheets listing debt); *Schroedl v. McTague,* 256 Iowa 772, 129 N.W.2d 19, 23 (1964) ("We hold that the income tax returns sufficiently acknowledged an existing indebtedness [by attached schedules of interest paid during the year for which the return was made] which could be identified by extrinsic evidence ..."). *Contra United States v. Jacobs,* 155 F.Supp. 182, 191 (D.N.J.1957). *Compare Federal Deposit Ins. Corp. v. Cardona,* 723 F.2d 132, 137 (1st Cir.1983) ("estate tax return, which lists as liabilities of the estate the principal amounts of the notes and the interest owed on each, constitutes a new promise to pay the debts evidenced by the notes.").[5]

5. Sometimes, a regularly kept business record can be a sufficient acknowledgment, too. *United States v. Culver,* 958 F.2d 39, 41 (4th Cir.1991) (listing of debt in financial statement to SBA); *Buxton v. Diversified Resources Corp.,* 634 F.2d 1313, 1317 (10th Cir.1980) (statement to corporate auditors signed by corporate president); *Whale Harbor Spa, Inc. v. Wood,* 266 F.2d 953, 954 (5th Cir.1959) (inclusion of debt on balance sheet); *In Re Meyrowitz' Estate,* 114 N.Y.S.2d 541, 547 (N.Y.Sur.1952), *summarily aff'd,* 284 A.D. 801, 132 N.Y.S.2d 327 (N.Y.App.Div.1954), *and appeal denied,* 284 A.D. 844, 134 N.Y.S.2d 587 (N.Y.App.Div.1954) (inclusion of debts in balance sheets); *Victory Investment Corp. v. Muskogee Electric Traction Co.,* 150 F.2d 889, 892 (10th Cir.1945) (debt shown on general trial balance and balance sheet submitted to bond trust-

Here, Associates Limited Partnership Agreement, at section 12.2, obligated the partnership to annually

> furnish to all Partners registered on the books of the Partnership, copies of the Partnership income tax return, together with copies of a general accounting for such year prepared by a certified public accountant in accordance with generally accepted accounting principles consistently applied. The accounting shall include statements of capital accounts, profits and losses, assets and liabilities and such other information customarily included in such accountings.[6]

Although Pear submitted a copy of only Associates's 1992 U.S. Return of Partnership Income, his affidavit showed:

> Similar returns were filed by the partnership each year. Upon information and belief the original returns which were filed with the I.R.S. contain the signature of Stan Hoye as General Partner.

Associates did not contradict this showing. Accordingly, we conclude that the trial court erred in entering summary judgment when genuine issues of material fact existed about Associates's acknowledgment of the continuing debt in signed income tax returns.

But we reverse and direct entry of summary judgment for Pear for a more compelling reason—a specific and unequivocal acknowledgment.

> In *Hoffman v. Ness*, 71 N.D. 283, 300 N.W. 428 (1941), we held that under [NDCC 28-01–36] an execution of a renewal note constituted a written acknowledgment of a prior debt, thereby starting the statute of limitations to run from the date of the renewal note. Thus, where a debtor signs a note indicating he owes a certain amount on a past debt, the debtor waives any statute-of-limitations defense he may have

had prior to signing the note, and the statute of limitations begins to run anew from the date he signs the renewal note.

*Regan Farmers Union Coop. v. Hinkel*, 437 N.W.2d 845, 847 (N.D.1989) (footnote omitted). Thus, a renewal note executed by the debtor sufficiently recognizes the debt.

Associates's renewal note, dated October 31, 1993, expressly acknowledged the continuing debt. "REPLACES ORIGINAL NOTE DATED 10/05/84" was typed into it. It was signed by "S.L. Hoye, Managing General Partner." The letter enclosing it stated, "A new note is enclosed to replace the original note." Even though Pear resisted the reduced interest rate, he holds the quintessential "acknowledgment or promise" of a "continuing contract."

Pear has not sued on the renewal, but rather seeks to collect the original debt. A renewal note is not itself payment but rather extends the time of payment of the former indebtedness unless the parties specifically agree that the original debt is to be extinguished. *Karzen v. Heitzmann*, 86 N.W.2d 514, 516 (N.D.1957). We presume that a new note does not discharge the antecedent debt. *C.A. Finch Lumber Co. v. Weishaar*, 55 N.D. 695, 215 N.W. 155, 156 (1927); *see also Butler v. Roberts*, 437 N.W.2d 839, 840 (N.D.1989); *Dakota Northwestern Bank Nat'l Assn. v. Schollmeyer*, 311 N.W.2d 164 (N.D.1981). Absent a clear intention to the contrary, an acknowledgment of a continuing debt generally renews not only liability for the principal debt, but also the liability for unpaid interest. 51 Am. Jur.2d *Limitation of Actions* § 322 (1970); *see also Kadrmas, Lee & Jackson, P.C. v. Bolken*, 508 N.W.2d 341, 346 (N.D.1993) (acknowledgments by partial payments on a debt "toll the statute of limitations for the entire debt"). Hoye has not offered any

---

ee); *see also* NDCC 31–08–01 (business records made in the regular course of business competent evidence); *Interstate Collection Agency, Inc. v. Kuntz*, 181 N.W.2d 234 (N.D.1970) (regularly kept business records given prima facie effect absent contradictory evidence); *Rheault v. Tennefos Construction Co.*, 189 N.W.2d 626 (N.D. 1971) (same). The business records reflected in the audit reports in this case had numerous entries recognizing this debt.

6. The "relationship between partners is confidential and fiduciary; they are trustees for each other, and they bear the obligation of the utmost good faith and integrity in their dealings with one another." *Matter of Estate of Thomas*, 532 N.W.2d 676, 683 (N.D.1995); *see also* NDCC 45–07–04(1) (replaced by NDCC 45–16–04, effective January 1, 1996).

contradictory evidence, and the fact that Pear resisted the reduction of interest supports the conclusion that the renewal did not discharge the debt.[7]

Thus, the renewal note here has not extinguished the original debt, but clearly evidences the continuing obligation. It unequivocally acknowledged the "ORIGINAL NOTE DATED 10/5/84" as a continuing contract, and is not a novation. As a result, Pear was entitled to sue on the entire original debt that is unpaid. The effect of the renewal note only decreased interest accruing on the principal amount after its date on October 31, 1993, from "prime +3%" to "Prime."

Accordingly, we conclude the trial court erred in granting Associates a summary judgment that barred David Pear's collection of his $100,000 demand note and interest accumulated to the date of the renewal. "Judgment shall be rendered forthwith if the" moving documents "show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." NDRCivP 56(c) (part). Therefore, we reverse the summary judgment for Associates, and direct entry of summary judgment for Pear, except to the extent that there may be issues of fact about determining the "prime" interest rate. We remand with directions to enter partial summary judgment for David Pear enforcing the demand note and accumulated unpaid interest at "prime +3%" to October 31, 1993, and at "Prime" thereafter.

This disposition makes it unnecessary to consider the other arguments of the parties on appeal. In sum, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.

---

7. The reason for the principle that a renewal note does not extinguish the antecedent debt is that a note merely evidences the debt, and it is not the debt itself. *C.A. Finch Lumber Co.*, 215 N.W. at 156; *Anderson v. Kain*, 40 N.D. 632, 169 N.W. 501, 503 (1918); *Guthmiller v. North Dakota Dep't of Human Services*, 421 N.W.2d 469, 473 (N.D.1988) ("Application of a statute of limitations ... operates only to bar the remedy and does not extinguish the debt or affect remedies other than the one to which it applies."); *Larson v. Quanrud, Brink & Reibold*, 78 N.D. 70, 47 N.W.2d 743, 750 (1950) ("In this state the statute of limitations operates to bar the remedy and does not destroy the debt or affect remedies other than the one to which it applies."); *Tracy v. Wheeler*, 15 N.D. 248, 107 N.W. 68 (1906) ("The fact that he may not be coerced to discharge them by legal means affects only the legal character of his obligation. It does not alter the primary fact that he owes an obligation which in equity and good conscience he should pay.").