2009 ND 172

In the Matter of the ESTATE OF
Ardis DIONNE, Deceased

Randall A. Dionne and Cynthia
A. Larson, Petitioners and
Appellants

v.

Norman Dionne, Individually and as
Personal Representative of the Estate
of Ardis Dionne, Respondent and Appellee.

No. 20090016.

Supreme Court of North Dakota.

Sept. 28, 2009.

Tom P. Slorby, Slorby Law office, Minot, ND, for petitioners and appellants.

Rebecca S. Thiem (argued) and James S. Hill (on brief), Zuger Kirmis & Smith, Bismarck, ND, for respondent and appellee.

VANDE WALLE, Chief Justice.

[¶ 1]   Randall Dionne and Cynthia Larson appealed from a summary judgment dismissing their petition to void a deed issued by Norman Dionne, as personal representative of the estate of Ardis Dionne, to himself.  We hold a distribution agreement for Ardis Dionne's estate, which precipitated the deed, is ambiguous, and we reverse the summary judgment and remand for further proceedings.

I

[¶ 2]   On November 19, 1998, Ardis Dionne died while residing in Hawaii.  She was survived by six children:  Linda Lewis; Randall Dionne;  Eileen Timmerman; Norman Dionne;  Cynthia Larson;  and Damian Dionne.  According to Larson, Ardis Dionne and her siblings each owned an undivided one-fourth remainder interest in three separate quarter sections of land in Mountrail County, in which Ardis Dionne's mother, Ellen Danielson, owned a life estate.  Larson claimed there were discussions about Norman Dionne receiving a 12 acre farmstead and buildings from Ardis Dionne's estate.

[¶ 3]   In November 2000, Norman Dionne was appointed personal representative of Ardis Dionne's estate.  In Ardis Dionne's last will, which was found in 2001, she devised all her property to her friend, Jim Goodness.  In April 2002, Norman Dionne, Cynthia Larson, and Linda Lewis met with Goodness in Hawaii to discuss Goodness's interest in the land.  In preparation for that meeting, three alternative distribution agreements for Ardis Dionne's property were prepared.

[¶ 4]   According to Larson, during the meeting in Hawaii, Goodness agreed that Ardis Dionne's children could take her entire estate as long as arrangements were made for the care of Danielson.  Larson claimed the three alternative distribution agreements did not provide for that contingency, and as a result, the parties signed one of the alternatives that described Ardis Dionne's estate's interest in the three separate quarter sections of land and provided in typewritten paragraph 4:

That the personal representative shall deal with the assets of the estate and distribute the estate in the following manner:

a.   The estate's interest in all of the above described real estate shall be conveyed    to    Norman    Dionne    for $_____.

b.   After paying administration expenses and creditor's claims, if any, all of the remaining assets of the estate (including the proceeds from the sale of the land) shall be distributed to James Goodness.

In paragraph 4(a), the parties inserted a handwritten figure of "1.00." In paragraph 4(b), the parties crossed out the name "James Goodness" and inserted a handwritten notation "Norman for maintenance 4/25/02."

[¶ 5] Larson claimed she realized the alternative signed by the parties would need to be revised when they returned from Hawaii:

I remember writing the words on the Agreement, "Norman for maintenance 4/25/02" to show that Norman [Dionne] would hold all of the money and the property in Ardis' Estate (except the 12 acre farmstead) for distribution to the six children after Ellen [Danielson] died. Norman [Dionne] was supposed to use the money for maintenance of this property during this time. It was never intended for Norman [Dionne] to take it all from Ardis' children.

I signed and initialed the agreement on April 25, 2002, in Hawaii, along with Jim [Goodness] and Norman [Dionne], with the understanding that the 12 acre farmstead would go to Norman [Dionne] and the remaining real property would be held for all of Ardis' children until Ellen [Danielson] passed away.

. . . .

I discussed with Norman [Dionne] that the Agreement would need to be revised to reflect the changes and Norman [Dionne] agreed, and then promised me that he would have [counsel] take care of it when we got back from Hawaii.

[¶ 6] Later in 2002, Norman Dionne, as personal representative of Ardis Dionne's estate, issued a deed for her interest in all her land to himself in his individual capacity. Danielson died in March 2007. In January 2008, Randall Dionne and Larson petitioned to void the personal representative's deed to himself and to transfer the land back to Ardis Dionne's estate for distribution. Randall Dionne and Larson claimed they signed the distribution agreement under the assumption they were agreeing to transfer only Ardis Dionne's undivided one-fourth remainder interest in the 12 acre homestead to Norman Dionne and they did not understand that the agreement allowed Norman Dionne to transfer all of Ardis Dionne's interest in the land to himself.

[¶ 7] The district court granted Norman Dionne's motion for summary judgment, concluding the distribution agreement was not ambiguous and clearly contemplated the conveyance of all of Ardis Dionne's interest in the land to Norman Dionne.

II

[¶ 8] We review this appeal in the posture of summary judgment, which is a procedural device for promptly resolving a controversy on the merits without a trial if either party is entitled to judgment as a matter of law, and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result. *Pear v. Grand Forks Motel Assocs.*, 553 N.W.2d 774, 778 (N.D. 1996); *Lire, Inc. v. Bob's Pizza Inn Rest., Inc.*, 541 N.W.2d 432, 433 (N.D.1995). Whether a district court properly grants summary judgment is a question of law that we review de novo on the record. *Ernst v. Acuity*, 2005 ND 179, ¶ 7, 704 N.W.2d 869.

III

[¶ 9] Randall Dionne and Larson argue the district court erred in granting summary judgment. They argue the distribution agreement is ambiguous and their consent to the agreement was obtained by fraud. Norman Dionne responds that Randall Dionne and Larson did not plead

fraud in their petition and the distribution agreement unambiguously authorizes Norman Dionne to convey Ardis Dionne's interest in all her land to himself.

[¶ 10] A decedent's successors may agree in a written contract executed by all who are affected by its provisions to alter the interests to which they are entitled under a will, and the personal representative shall abide by the terms of the agreement. N.D.C.C. § 30.1–20–12. Here, Norman Dionne claims he executed a personal representative's deed to himself under the unambiguous terms of the parties' April 2002 distribution agreement. Under N.D.C.C. § 30.1–18–13, a personal representative's sale of any property in an estate to the personal representative is voidable by any person interested in the estate, except one who has consented after fair disclosure, unless the will or a contract entered into by the decedent expressly authorized the transaction, or the transaction is approved by the court after notice to interested persons.

### A

[¶ 11] Randall Dionne and Larson argue their consent to the distribution agreement was obtained by fraud and is void. Under N.D.R.Civ.P. 9(b), the circumstances constituting averments of fraud must be stated with particularity. "No particular form or language is required in alleging fraud so long as the elements constituting fraud may be found from reading the whole pleading." *Miller Enterprises, Inc. v. Dog N' Cat Pet Centers*, 447 N.W.2d 639, 643 (N.D.1989). "[W]hen the plaintiff makes an allegation of fraud the defendant must receive enough information to prepare a response and defense, and the plaintiff must apprise the defendant fairly of the charge." *Id.*

[¶ 12] Under N.D.C.C. § 9–03–08, actual fraud consists of any of the following acts committed by a party to a contract

with intent to induce another to enter into the contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true;

3. The suppression of that which is true by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or

5. Any other act fitted to deceive.

Constructive fraud includes "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault ... by misleading another to the other's prejudice." N.D.C.C. § 9–03–09.

[¶ 13] Here, the amended petition alleges Norman Dionne was appointed personal representative of Ardis Dionne's estate in 2000 and:

7. Around the same time, the heirs discussed the possibility of Norman Dionne receiving Ardis' undivided 1/4 remainder interest in a 12 acre parcel (hereafter "Homestead"). It was agreed that a survey would be done on the land in order to obtain a separate legal description for the Homestead, and that Ardis' undivided 1/4 remainder interest in the surveyed 12 Acres would be transferred to Norman Dionne....

8. As part of the distribution of Homestead, the Petitioners were hand-delivered copies of three different proposed versions of the "Agreement on Distribution" of the real property by Norman Dionne and asked to sign the document.

9. Petitioners signed the Agreement under the assumption that they were

agreeing to the transfer of Ardis' undivided 1/4 remainder interest in the 12 Acre surveyed Homestead to Norman Dionne, and no more.

10. Petitioners did not understand that the agreement they signed allowed Norman Dionne to transfer all of Ardis' undivided 1/4 remainder interest in the real property located in Mountrail County to himself.

11. On June 11, 2002, without a Court prior order and without notice or disclosure, Norman Dionne, as personal representative of the Ardis Dionne estate, executed a Deed of Personal Representative conveying all of the estate's interest in the real property to Norman Dionne, individually.... A copy of this deed was never provided to the Petitioners.

■■■ [¶ 14] The petition essentially alleges the petitioners signed the distribution agreement "under the assumption that they were agreeing to the transfer" of the homestead to Norman Dionne, and the petitioners "did not understand that the agreement they signed" allowed Norman Dionne to transfer all of Ardis Dionne's interest in the land to himself. Allegations of assumptions and understandings by a party to an agreement do not alone allege fraud by the other party to that agreement. Misunderstandings and assumptions are often unilateral to one party and their existence does not constitute fraud by the other party. Rather, they more often signal a dispute as to the interpretation of the agreement. We agree with Norman Dionne that the language of the petition, read as a whole, does not allege any facts with particularity which constitute fraud. We conclude Randall Dionne and Larson are not entitled to claim fraud as a basis for voiding the personal representative's deed.

B

■ [¶ 15] Randall Dionne and Larson also claim the agreement on distribution is ambiguous.

[¶ 16] In *Pamida, Inc. v. Meide*, 526 N.W.2d 487, 490 (N.D.1995) (citations omitted), we outlined well-established rules for construing written contracts:

The construction of a written contract to determine its legal effect is a question of law. A contract is to be interpreted to give effect to the mutual intention of the parties at the time of contracting. Under § 9–07–04, N.D.C.C., the intention of the parties to a written contract is to be ascertained from the writing alone, if possible. If executed documents are unambiguous, parol evidence is not admissible to contradict the terms of the written agreement. If a written contract is ambiguous, extrinsic evidence can be considered to clarify the parties' intent. "[W]here the contract is clear and unambiguous there is no reason to go further." Whether or not a contract is ambiguous is a question of law. "An ambiguity exists when rational arguments can be made in support of contrary positions as to the meaning of the term, phrase, or clause in question." If the parties' intentions can be ascertained from the writing alone, then the interpretation of the contract is entirely a question of law, and we will independently examine and construe the contract to determine if the district court erred in its interpretation of it. "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract."

[¶ 17] In paragraph 4 of the parties' typed distribution agreement, the parties

inserted handwritten notations specifying the amount of consideration, $1.00, and changing the recipient of the remaining assets of the estate, including the gross proceeds from the sale of the land, from "James Goodness" to "Norman Dionne for maintenance 4/25/02." Under N.D.C.C. § 9–07–16, when a contract is partly written and partly preprinted, the written parts control the preprinted parts. *See Thiel Indus., Inc. v. Western Fire Ins. Co.,* 289 N.W.2d 786, 788 (N.D.1980); *Olson v. Peterson,* 288 N.W.2d 294, 298 (N.D.1980). The handwritten insertions in paragraph 4 of the parties' typewritten distribution agreement control and must be construed to have meaning, but the meaning of the phrase to "Norman for maintenance 4/25/02" is not clear from the four corners of the agreement. Larson's affidavit claims the handwritten words "Norman for maintenance 4/25/02" were inserted:

> to show that Norman [Dionne] would hold all of the money and the property in Ardis' Estate (except the 12 acre farmstead) for distribution to the six children after Ellen [Danielson] died. Norman [Dionne] was supposed to use the money for maintenance of this property during this time. It was never intended for Norman [Dionne] to take it all from Ardis' children.

> I signed and initialed the agreement on April 25, 2002, in Hawaii, along with Jim [Goodness] and Norman [Dionne], with the understanding that the 12 acre farmstead would go to Norman [Dionne] and the remaining real property would be held for all of Ardis' children until Ellen [Danielson] passed away.

However, Norman Dionne claims the distribution agreement clearly and unambiguous conveyed Ardis Dionne's interest in all her real property to him.

[¶ 18] We believe Randall Dionne and Larson have offered a rational argument in support of their interpretation of the agreement, which is contrary to Norman Dionne's interpretation. There also may be other rational interpretations of the language in the agreement. We conclude the distribution agreement is ambiguous, and the parties' intentions cannot be ascertained from the four corners of the distribution agreement and extrinsic evidence is permissible to clarify the parties' intent. *See Pamida,* 526 N.W.2d at 490. *See also* N.D.C.C. § 32–04–17 (mutual mistake or unilateral mistake are grounds for revision of written contract). We therefore conclude the district court erred in granting summary judgment dismissing the claims of Randall Dionne and Larson.

IV

[¶ 19] We reverse the summary judgment and remand for further proceedings consistent with this opinion.

[¶ 20] JOHN C. IRBY, D.J., DONOVAN J. FOUGHTY, D.J., and JOHN C. McCLINTOCK, D.J., concur.

[¶ 21] The Honorable DONOVAN JOHN FOUGHTY, D.J., JOHN C. McCLINTOCK, D.J., and JOHN CHARLES IRBY, D.J., sitting in place of MARING, J., CROTHERS, J., and KAPSNER, J., disqualified.

SANDSTROM, Justice, dissenting.

[¶ 22] Under the terms of Ardis Dionne's one-page handwritten will, she left her entire estate to James Goodness. Her will left absolutely nothing to those involved in this action. A document signed by James Goodness, Norman Dionne, and Norman Dionne's five siblings had the effect—as ruled by the district court—of transferring the Mountrail County real estate to Norman Dionne in 2002. Seven years later—after the onslaught of intense oil-drilling activity in Mountrail County—two of the siblings brought this action seeking to void the transfer to Norman

Dionne. Neither James Goodness nor the other siblings joined in the action.

[¶ 23] Paragraph four of the signed agreement provided in relevant part:

> That the personal representative shall deal with the assets of the estate and distribute the estate in the following manner:
>
> a. The estate's interest in all of the above described real estate shall be conveyed to Norman Dionne for $ *1.00*.
>
> b. After paying administration expenses and creditor's claims, if any, all of the remaining assets of the estate (including the proceeds from the sale of the land) shall be distributed to ~~James Goodness.~~ *Norman for maintence* [sic] *4/25/02*.

(Strikeout and italicized language handwritten.)

[¶ 24] The district court found the language unambiguous.

[¶ 25] Since the will left all of the property to Goodness, he would have been free to do anything he wanted with it. The disputed document would have done nothing at all without Goodness's signature, which turned it into a disclaiming of the bequest by Goodness. *See* N.D.C.C. §§ 30.1–10.1–02(1) ("A person may disclaim, in whole or in part, any interest in or power over property ....") and 30.1–10.1–03(3) ("The disclaimed interest passes according to a provision in the instrument creating the interest providing for the disposition of the interest, should it be disclaimed, or of disclaimed interests in general.") Without this disclaiming, there would have been nothing for the siblings to agree to because they were left nothing under the will. With the disclaiming, the siblings—Ardis Dionne's children—would become the heirs because the will contained no provision in case Goodness disclaimed. *See* N.D.C.C. § 30.1–09–05. With the document disclaiming, it would then also have the effect, under N.D.C.C. § 30.1–20–12, of an agreement among the heirs (who had nothing to agree to without Goodness's signature).

[¶ 26] Long after the fact, two of the siblings, Cynthia Larson and Randall Dionne, making contradictory and facially false statements, sought to challenge the document and the transfer of the property under its terms.

[¶ 27] According to Larson, she and Norman Dionne and their sibling, Linda Lewis, met with Goodness in Hawaii, where they and Goodness executed the document. Of the four present, only Larson claims irregularity. The other disputant, Randall Dionne, was not present in Hawaii.

[¶ 28] In her brief, Larson asserts, "The parties dispute who was responsible for the language of the alternative agreements that were prepared by Attorney Aljets. (App. 66–68)." The cited references reflect no such dispute. Norman Dionne says it was Larson who asked Aljets to prepare the alternative agreements to take to Goodness. Larson's affidavit does not dispute that and, in fact, at ¶ 19, says, "Attorney Aljets drafted some sample Agreements and faxed them to me on September 4, 2001 shortly before our trip. There were three separate Agreements because we were not sure what Jim would agree to, if anything. Photocopies of the Agreements are attached hereto as Exhibit 'C'."

[¶ 29] In her affidavit, at ¶ 20, Larson claims, "I didn't pay much attention to the legal descriptions in the three separate Agreements as I am not legally trained to read legal descriptions and there was no way to know what the legal description would be on the 12 acre farmstead until a survey was done on the property." But other unexecuted agreements which Larson received from Aljets and attached to her affidavit plainly identified the 12–acre farmstead and treated it differently than

the agreement executed. Paragraph four on one agreement said:

> That the personal representative shall deal with the assets of the estate and distribute the estate in the following manner:
>
> a. *The estate's interest in the farmstead* located on Section 19–T152N–R90W *consisting of the buildings, tree stand and approximately 12 acres shall be conveyed to Norman Dionne.*
>
> b. The estate's interest in the balance of the real estate (other than the farmstead) shall be sold by the personal representative at its fair market value.
>
> c. After paying administration expenses and creditor's claims, if any, all of the remaining assets of the estate (including the proceeds from the sale of the land) shall be distributed to James Goodness.

(Emphasis added.) Paragraph four of the other agreement said:

> That the personal representative shall deal with the assets of the estate and distribute the estate in the following manner:
>
> a. *The estate's interest in the farmstead* located on Section 19–T152N–R90W *consisting of the buildings, tree stand and approximately 12 acres shall be conveyed to Norman Dionne* for $_____.
>
> b. The estate's interest in the balance of the real estate (other than the farmstead) shall be sold by the personal representative at its fair market value.
>
> c. After paying administration expenses and creditor's claims, if any, all of the remaining assets of the estate (including the proceeds from the sale of the land) shall be distributed to James Goodness.

(Emphasis added.) Unlike the unexecuted agreements, the executed agreement says nothing about a "12 acre farmstead."

[¶ 30] In her affidavit, at ¶ 24, Larson acknowledges that it was she who wrote the main handwritten revision on the executed agreement: "I remember writing the words on the Agreement, 'Norman for maintenance 4/25/02' . . . ."

[¶ 31] I agree with the district court that the agreement is not ambiguous. James Goodness was to receive everything under the will. He could have accepted the inheritance and done whatever he chose with it. Instead, presented with three alternative documents, he chose to execute the one that disclaimed his interest and directed that all the real estate be sold to Norman Dionne for one dollar and then the one dollar be paid to Norman Dionne. I would affirm.

[¶ 32] DALE V. SANDSTROM